**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-1676-MSK-NYW

**SHANNON ZBYLSKI,**

Plaintiff,

v.

**DOUGLAS COUNTY SCHOOL DISTRICT; PATRICIA DIERBERGER**, in her individual capacity; and **JAMES MCMURPHY,** in his individual capacity,

Defendants.

---

### PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

---

Pursuant to F.R.C.P. 37(b) and (c) and the Court's inherent powers, Plaintiff Shannon Zbylski ("Plaintiff" or "S.Z.")[1] moves this Court for an order imposing sanctions and granting relief against Defendants Douglas County School District ("DCSD"), Patricia Dierberger ("Dierberger") and James McMurphy ("McMurphy") (collectively, "Defendants") for failure to disclose and for spoliation of material evidence.

#### CERTIFICATION OF COUNSEL

Undersigned counsel certifies that she has conferred with counsel for Defendants regarding this Motion.  Defendants oppose this Motion and the relief sought herein.

---

[1]While Plaintiff has used her real name in this case, other former DCSD students were minors during events at issue in this case.  To provide some  privacy and for consistency, throughout this brief, all former DCSD students will be referred to by their initials only.  Adults will be referred to by their last names after they are introduced.

1

## INTRODUCTION

During much of the 2010-2011 school year, S.Z. was sexually harassed by a DCSD teacher, Richard Johnson.  By the first full week of April 2011, Johnson, a math teacher at Rocky Heights Middle School ("RHMS"), had escalated from sexually harassing, grooming behaviors (such as encouraging S.Z. to confide in him, isolating her from her family, engaging in full-body intimate hugs with her, and asking sexually suggestive and otherwise inappropriate questions) to initiating sexual activity upon S.Z.  That sexual activity ultimately resulted in many dozens of sexual assaults, which began in late May or early June 2011, two months after S.Z. turned 14 years old and just days after she finished her eighth grade year.

From early in the 2010-2011 school year, and continuing until well after Johnson began raping S.Z., DCSD, then-RHMS Principal Dierberger, and then-RHMS Assistant Principal McMurphy, ignored repeated warnings from students and parents that Johnson was engaging in inappropriate and often sexualized behaviors with S.Z.  Even after DCSD was contacted in early June 2012 by a special victim's unit ("SVU") detective from the Douglas County Sheriff's Office ("Sheriff's Office"), who was inquiring about Johnson and S.Z.,[2] Defendants failed to investigate or take any action to prevent Johnson's ongoing sexual harassment and sexual assaults.

Whether Johnson sexually harassed and sexually assaulted S.Z. is not at issue in this lawsuit brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX") and 42 U.S.C. § 1983 ("§ 1983"); Johnson has already pled guilty and been sentenced to 20

---

[2]Aragon Dep. Tr., Exh. 1, at 123:20-124:5.

years in prison for his crimes against S.Z.[3]  What is at issue, however, is what Defendants knew

or were told about Johnson's inappropriate behavior and sexual misconduct toward his students,

particularly S.Z., and how Defendants responded.

While Defendants deny that they had notice of the sexualized relationship between Johnson

and S.Z., that their failure to investigate reports of Johnson's inappropriate behaviors and

relationship with S.Z. increased her vulnerability to sexual assault, and that the risk to S.Z. was

obvious or known, *see* Answer to Second Am. Complt. at ¶¶ 7-8, 50, 59, 62, deposition testimony

reveals otherwise.  The testimony reveals that there was substantial notice to Defendants of the

potential that Johnson would sexually harass or assault S.Z., and that written evidence of that notice

existed in records that Defendants failed to preserve or destroyed despite a duty to preserve the

records.  Those records include at least the following:

- Dierberger's handwritten notes of Johnson's inappropriate conduct with a young girl in a short skirt in his classroom in 2010 or earlier;

- Disciplinary documents regarding two African-American students who reported the inappropriate, sexualized relationship between S.Z. and Johnson to Dierberger and McMurphy in April 2011 but were then suspended for "disruptive" conduct;

- At least one written statement by one of those students, prepared in April 2011, that described Johnson's troubling, inappropriate, and sexualized conduct toward S.Z. and the widespread brief that the relationship had turned sexual;

- Dierberger's handwritten notes of at least one key meeting with parents in June 2011, when they described Johnson's threats to their son for reporting Johnson's disturbing and sexualized relationship with S.Z. and then requested that Johnson's inappropriate relationship with S.Z. be investigated;

- Dierberger's notes regarding Johnson's increasingly erratic behavior and her concerns about his "personal issues" and response to "rumors" in 2011-2012, during the time that Johnson was continuing to rape S.Z.; and

---

[3]*See* Exhs. 2 and 3.  Pursuant to F.R.C.P. 5.2, S.Z. has redacted Johnson's birthdate and some addresses from Exhibit 2.

- Notes and documentation created during a March 2012 DCSD investigation after Johnson was caught engaging in conduct physically endangering another RHMS student, an investigation that revealed that another DCSD administrator expressed concerns regarding Johnson's interactions with young, female students.

Throughout discovery, Defendants have offered various excuses for why these documents are now missing or were apparently destroyed, including claims that documents were destroyed prior to notice of a duty to preserve or, in some cases, remarkably denying that the documents ever existed. But nearly all of these missing documents should have been preserved pursuant to a preexisting duty under federal regulations, Colorado law, or DCSD policy as well as a duty arising from reasonable anticipation of potential litigation.

Defendants' destruction of these documents significantly prejudices S.Z. because the destroyed or missing documents relate to one of the core issues in this case, Defendant's notice and/or knowledge of Johnson's sexual harassment and sexual assaults of S.Z. Because S.Z. must now pursue her claims without that evidence, she requests that this Court sanction Defendants for failure to preserve or disclose and/or for the destruction of the relevant, discoverable records.

## FACTUAL BACKGROUND

At the beginning of the 2010-2011 school year, Johnson, who was S.Z.'s eighth grade math teacher, had his math students write down for him the issues that they struggled with outside of school, apparently to identify and target vulnerable, young female students like S.Z.[4]   Beginning that same fall and continuing until the spring, Johnson showered attention on S.Z., convincing her to confide in him about personal issues; "secret[ly]" giving her his cell phone number; writing her personal notes at school; taking her out of class to be alone with him in his classroom; plying her

---

[4] G.B. Decl., Exh. 4, at ¶ 2; S.Z. Dep. Tr., Exh. 5, at 100:12-20.

with personal, increasingly sexualized questions; texting her frequently; and alienating her from her friends and family.[5]  In early April 2011, Johnson escalated his grooming efforts and initiated disturbing sexual activity upon S.Z. (including in a corner of his RHMS classroom), efforts that culminated with sexual assaults that began almost immediately after the school year ended in late May 2011.[6]

### Dierberger's Notes of Johnson's Prior Misconduct with Other Young, Female Students

Even before Johnson began to prey on S.Z., Defendants had repeated notice of the risk that Johnson posed to his young, female middle school students.  Dierberger has admitted that before S.Z. was sexually assaulted, she discovered Johnson alone in his classroom with a young female student sitting on his desk, wearing a short skirt, and facing him.  Dierberger Dep. Tr., Exh. 6, at 131:6-20.  Dierberger testified that she would have made a note about this encounter and put it in a folder she kept in her desk for documentation of teacher behavior issues.[7]  Dierberger has testified that she later destroyed that note and folder, in approximately mid- to late-August 2012.

During the fall of 2010, rumors circulated that Johnson had initiated a sexual relationship with another eighth grade student, G.B., who was also being groomed by Johnson with flattery, handwritten notes, and even calls to her personal cell phone.  G.B. Decl., Exh. 4, at ¶¶ 3, 7, 14-15; Buck Decl., Exh. 7, ¶¶ 5.  After G.B. notified several RHMS teachers about the rumors, Dierberger met with Johnson, GB, and the male student accused of spreading the rumors, and

---

[5]*See* S.Z. Dep. Tr., Exh. 5, at 53:15-23, 56:24-57:4, 59:20-61:2, 79:6-80:20, 85:5-10, 116:5-13.

[6] *Id*. at 84:15-24, 86:2-7, 88:18-89:5, 90:24-91:13, 92:25-93:9, 233:8-21.

[7] Dierberger Dep. Tr., Exh. 6, at 44:5-45:6, 132:18-25.  Dierberger routinely made notes regarding student, teacher, and parent concerns. *Id*. at 281:6-282:10.  Although these important documents were oddly maintained only in her "personal file," Dierberger  kept the "personal file" at her desk to "jog [her] memory as things happened." *Id*. at 44:5-45:6. In many cases, as addressed below, her notes seem to be the only record of events discussed in this Motion.

ordered that the male student provide a written apology to Johnson.  G.B. Decl., Exh. 4, at ¶¶ 3-6; Buck Decl., Exh. 7, at ¶¶ 2-3.  While it would have been Dierberger's normal practice to take notes at this meeting, *see supra* n. 7, DCSD has asserted that it has no records of the meeting, the disciplinary action against the male student, or the apology written to Johnson.  *See* Exh. 8 at 3.

### <u>The Disciplinary Records for K.G. and K.C.</u>

As the 2010-2011 school year progressed, Johnson increasingly focused his attentions on S.Z., and rumors began to circulate and intensify regarding their inappropriate, close and intimate relationship.[8]  During the week of April 4, 2011, Johnson took preemptive action to address such talk and reported two students, K.G. and K.C., for spreading rumors about his inappropriate relationship with S.Z.  The boys were pulled out of class and sent to Dierberger's office, where both met with Dierberger, and K.C. also met with McMurphy.[9]

While it is undisputed that KG. and K.C. were initially given an in-school suspension,[10] Dierberger and McMurphy provide conflicting accounts of the reason for the suspension. Dierberger testified that the boys – including K.G., who had never been sent to a principal's office before[11] – complained that Johnson was playing "favorites" and were given in-school suspensions for being "disruptive" in class; McMurphy testified that the boys were disciplined for "speaking inappropriately about a student and teacher" and "innuendo" about S.Z. and Johnson.[12]  Other

---

[8] *See, e.g.*, G.B. Decl., Exh. 4, at ¶¶ 8-10; K.G. Dep. Tr., Exh. 9, at 123:18-124:1.

[9] K.G. Dep. Tr., Exh. 9, at 106:15-20, 117:15-118:20; K.C. Dep. Tr., Exh. 10, at 51:8-23.

[10] Dierberger Dep. Tr., Exh. 6, at 205:1-10; 221:7-12; 224:3-7; McMurphy Dep. Tr., Exh. 11, at 238:16-239:5.

[11] Gross Dep. Tr., Exh.12, at 140:3-12; Dierberger Dep. Tr., Exh. 6, 178:5-11, 228:18-21.

[12] *Compare* Dierberger Dep. Tr., Exh. 6, at 176:14:-178:4, 216:12-22, 224:3-7 *with* McMurphy Dep. Tr., Exh. 11, at 203:24-204:19.

DCSD representatives have conceded that the boys were initially suspended for talking about Johnson's inappropriate relationship with S.Z.[13]  And both boys and their respective parents have consistently testified that the boys were suspended for spreading "rumors" about Johnson's conduct toward S.Z.[14]  Indeed, when contacted by Dierberger about her son's suspension, K.G.'s mother told Dierberger that many students were talking about Johnson's inappropriate relationship with S.Z., pleading with her to take the matter seriously and investigate.  Gross Dep. Tr., Exh. 12, at 90:3-94:3.  Similarly, K.C.'s father likewise urged McMurphy to investigate because "[f]or my son to serve a day or two of suspension in-house is nothing compared to [S.Z.] being violated[.]"  Coleman Dep. Tr., Exh. 15, at 30:1-23.

Defendants have advised, however, that apart from a lone email that references the incident a week later, **no** other disciplinary records exist.[15]  There are no initial referral slips,[16] no notes from Dierberger's meetings with the students and Johnson or from Dierberger's and McMurphy's discussions with their parents, and no other disciplinary documents regarding the suspension, although RHMS carefully documented minor infractions by K.C. on other occasions.[17]

---

[13] McMinimee Dep. Tr., Exh. 13, at 121:13-122:6; Ross Dep. Tr., Exh. 14, at 123:22-124:6.

[14] *See, e.g.*, K.C. Dep. Tr., Exh. 10, at 20:2-13, 51:19-23, 74:7-19; K.G. Dep. Tr., Exh. 9, at 118:4-20; Coleman Dep. Tr., Exh. 15, at 22:1-23:13, 28:5-29:16, 30:1-23; Gross Dep. Tr., Exh. 12, at 66:16-21.

[15] *See* Exh 16.

[16] *See* Holst Dep. Tr., Exh. 17, at 86:2-87:14; Ross Dep. Tr., Exh. 14, at 249:11-17.

[17] Ross Dep. Tr., Exh. 14, at 252:13-254:20; Dierberger Dep. Tr., Exh. 6, 198:10-14.

**K.C.'s Written Statement Describing Johnson's Sexual Misconduct Toward S.Z.**

One of the students, K.C., has further testified that when he was sent to the RHMS principal's office for talking about Johnson's inappropriate, sexualized relationship with S.Z., he not only told McMurphy about Johnson's troubling behaviors, such as his close, full-body hugs (embraces) of S.Z., but that he also completed a written statement at McMurphy's direction.[18]  In that statement, K.C. described how Johnson hugged S.Z., why he thought the relationship was sexual, and how many students believed that Johnson and S.Z. had a sexual relationship.[19]  After K.C. finished writing the statement for McMurphy, Dierberger "grabbed" the statement from him. K.C. Dep. Tr., Exh. 10, 60:6-17.  The next morning, McMurphy had K.C.'s statement and showed it to K.C.'s father, who then questioned McMurphy about the statement.  *See* Coleman Dep. Tr., Exh. 15, at 28:5-29:16.  Although K.C.'s statement should have been preserved, pursuant to federal regulations, state statute, and DCSD policy, in both Johnson's personnel records and K.C.'s disciplinary file, it has disappeared.

**Dierberger's Notes of the Meeting With K.G.'s Parents to Address Johnson's confrontation of K.G. and Their Concerns Regarding Johnson's Inappropriate Relationship with S.Z.**

Shortly after school ended in late May 2011, just as Johnson was beginning to sexually assault S.Z., Johnson ran into K.G. at a community recreational facility and physically threatened him for "running his mouth" about Johnson and S.Z.'s relationship.[20]  After learning of the incident that same day, K.G.'s mother demanded a meeting with Dierberger and a DCSD supervisor, which

---

[18] K.C. Dep. Tr., Exh. 10, at 53:20-54:17; 55:7-16.

[19] *Id*. at 54:10-17, 76:15-19, 80:2-11, 107:2-15.

[20] K.G. Dep. Tr., Exh. 9, at 175:6-176:7; Gross Dep. Tr., Exh. 12, at 100:21-101:6.

was scheduled for a few weeks later.  Exh. 18.  At the meeting, K.G.'s mother told Dierberger and

the DCSD supervisor about Johnson's harassment of her son and again urged them to take action

to protect S.Z.  K.G.'s mother recalls that at least the DCSD supervisor took notes.[21]  Dierberger

also testified that she believes she took notes at the meeting, as she would "normally do," and put

them in her personal file (and not Johnson's personnel file).[22]  In addition, Dierberger told K.G.'s

parents that a formal letter would also go in Johnson's file documenting the misconduct,[23] which

is what a former top DCSD administrator testified should have happened.  McMinimee Dep. Tr.,

Exh. 13, at 305:11-21.  No notes or letters have been produced from Johnson's personnel file, and

Dierberger has testified that she later destroyed her notes, in mid-to-late August 2012.[24]

**Dierberger's Notes of Johnson's Increasingly Erratic Behavior and his Personal Issues**

After the 2011-2012 school year began, Dierberger testified that Johnson's behavior grew

increasingly erratic, and she raised concerns with him repeatedly.  She testified that she again

documented these conversations in the "notes" she kept in her personal file.[25]  But while a few

emails allude to her concerns (including one in which she told Johnson she would be a "fool" to

believe all the "rumors" that were "out there"),[26] Defendants have not produced any of

Dierberger's documentation of those issues, even though Dierberger sought a leave of absence for

---

[21] Gross Dep. Tr., Exh. 12,  at 103:18-104:7; 142:19-144:14

[22] Dierberger Dep. Tr., Exh. 6, at 250:20-251:1, 255:23-25, 256:11-20.

[23] K.G. Dep. Tr., Exh. 9, 176:21-177:18; Gross Dep. Tr., Exh. 12, 103:18-104:7.

[24] Dierberger Dep. Tr., Exh. 6, at 259:14-18; 280:22-282:13.

[25] *Id*. at 49:22-51:19, 83:5-16.

[26] *See* Exh. 19.

Johnson after what she described as his break-down. Presumably, all documentation regarding these concerns was contained solely in Dierberger's personal file, which she inexplicably shredded in August 2012. *See infra.*

### DCSD's Investigation into Johnson's March 2012 Misconduct

In June 2012, Johnson's employment with DCSD formally ended. Less than three months earlier, in March 2012, Johnson had been caught on videotape laughing as some of his students threw another student into the air and let him fall hard to the ground. Exh. 20. On March 21, 2012, Dierberger attended a meeting regarding Johnson and was joined by an HR director and a union representative. Exh. 21. Dierberger testified that her notes about the child-throwing incident would have been included in the "official folder" at DSCD, although no notes or other records of that meeting have been produced. Dierberger Dep. Tr., Exh. 6, at 83:17-23. At that meeting or shortly thereafter, Johnson agreed to resign, Exh. 22, although a final separation agreement was not executed until June 7, 2012 (and signed by DCSD counsel on June 12, 2012). *See* Exh. 23. Defendants have produced the final, executed separation agreement and a single November 2012 memorandum regarding the March 2012 investigation. The November 2012 memorandum documents that at least one other DCSD administrator had previously expressed concern over Johnson's interactions with young, female students, although no other records regarding the March 2012 investigation were provided. *See* Exhs. 20, 22, 23.

### The Sheriff's Office Contacts DCSD Inquiring About Johnson and S.Z.

Meanwhile, in early June 2012, days before Johnson's separation agreement was finally executed, Sheriff's Office Special Victim's Unit ("SVU") Detective Dea Aragon communicated several times with Mark Knapp, a DCSD security manager, seeking information regarding

Johnson.  Aragon Dep. Tr., Exh. 1, 90:23-92:22.  On June 4 and 5, 2012, Aragon emailed Knapp, requesting information about Johnson and a few DCSD students, including S.Z.  *See* Exh. 24. [27] Knapp knew that there was a Sheriff's Office investigation and that Aragon worked with SVU, although Aragon did not communicate specifics about the investigation of Johnson.  Aragon Dep. Tr., Exh. 1, at 123:20-124:5.  After Knapp provided Aragon with the requested information about Johnson and the students, Knapp told Aragon he would "try and find out more later this week."  Exh. 24 at 8.  Dierberger, still the RHMS principal, was Johnson's direct supervising principal until he resigned.  Dierberger Dep. Tr., Exh. 6, at 146:3-13.

DCSD has admitted that when DCSD's Security Department is contacted by the Sheriff's SVU – which DCSD knew investigated sexual crimes against children, Ross Dep. Tr., Exh. 14, at 68:14-69:6 – with a request for information regarding a DCSD employee, DCSD's Security Department seeks information from the Human Resources department, the employee's school, and/or the Legal Department.  *Id.* at 195:11-197:1.  In early June 2012, when Aragon contacted DCSD's Security Department, DCSD knew that there was an investigation by the SVU concerning Johnson, and DCSD's Human Resources department, Legal Department, and RHMS leadership (where Dierberger was still principal) were all aware of Johnson's pending separation from DCSD and his role in the child-throwing incident.  At least Dierberger and McMurphy also knew of multiple reports regarding Johnson's alleged sexual misconduct with S.Z.  *See supra.*

Nearly four weeks later, on June 30, 2012, Dierberger retired from DCSD.  Ross Dep. Tr., Exh. 14, at 201:19-202:5. She took boxes of files with her, including all of her notes on student, teacher, and parent concerns, which she kept in her desk folder.  Dierberger Dep. Tr., Exh. 6, at

---

[27] Pursuant to F.R.C.P. 5.2, S.Z. has redacted birthdates, addresses and a social security number from Exhibit 24.

83:24-84:24. Dierberger testified that approximately six to seven weeks later she decided to shred, by hand, all of her notes in that file, including her records on Johnson's misconduct and her meetings with K.G.'s parents, because she "didn't need" them anymore.[28]   Based upon her testimony, Dierberger destroyed those documents in mid-to-late August 2012, ***nearly three months after*** the Sheriff's Office contacted DCSD seeking information about Johnson and S.Z. for an investigation, and less than three months before Johnson was charged with dozens of felonies for his sexual abuse and sexual assaults of S.Z.

In late October 2012, the Sheriff's Office resumed working with DCSD personnel to collect records regarding Johnson, including his personnel file.   *See* Aragon Dep. Tr., Exh. 1, 177:11-178:16.   On November 13, 2012, Johnson was arrested. *See id.* 181:1-4. On March 13, 2013, S.Z. sent a notice under the Colorado Government Immunity Act ("CGIA") regarding potential claims against DCSD.   *See* Exh. 25.   DCSD counsel issued its first litigation hold letter on August 28, 2013.   *See* Exh. 26.

<u>**ANALYSIS**</u>

A.      <u>**The Applicable Legal Standards**</u>

Pursuant to Rule 37(b) and(c) and its inherent powers, this Court may impose sanctions for spoliation of evidence when a moving party suffers prejudice because the nonmoving party has failed to preserve or has destroyed evidence.   *See, e.g., Crandall v. City and County of Denver*, 2006 WL 2683754 at *1-2 (D. Colo. 2006); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007).   Under Tenth Circuit law, a spoliation sanction is warranted

---

[28] *Id.* at 46:7-15, 83:10-15, 83:24-84:5, 85:14-86:10.   Dierberger also periodically "purged" the teacher file folders, especially if the teacher had left.  *Id.* at 47:17-48:25; 89:10:-90:1.

when (1) a party had a duty to preserve evidence, and (2) the adverse party is prejudiced by the destruction of or failure to preserve that evidence. *Burlington N. and Santa Fe Ry. Co. v. Grant*, 505 F. 3d 1013, 1032 (10th Cir. 2007) (citation omitted). The moving party has the burden of proving that the opposing party failed to preserve evidence or destroyed it by a preponderance of the evidence. *Ernest v. Lockheed Martin Corp.*, 2008 WL 2945608 at *1 (D. Colo. July 28, 2008).

There are two ways the duty to preserve evidence can be triggered. First, a duty to preserve records arises when there is a statute or administrative regulation requiring that the records be maintained. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987). In *Hicks*, the Tenth Circuit addressed the defendant's destruction of personnel records, such as daily reports that contained notes regarding job performance, and held that because there was an administrative requirement to retain those records under 29 C.F.R. § 1602.14(a), the plaintiff was entitled to an adverse inference as result of their destruction. *Id.*; *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2001) (citing numerous federal decisions holding that destruction of evidence in violation of regulations requiring its retention can give rise to spoliation inference).

Second, a duty to preserve evidence also arises when a party has notice or should have known the evidence may be relevant to potential future litigation. *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007) (citing *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). The filing of a formal complaint or demand is not required to trigger notice of pending future litigation. *Id.* at 621. Rather, that duty arises when "a reasonable

party in the same factual circumstances would have reasonably foreseen litigation." *Micron Technology, Inc. v. Rambus Inc.,* 645 F.3d 1311, 1320 (Fed. Cir. 2011).

This standard is flexible and fact-intensive, allowing a court "to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Id.* (citation omitted). Courts have therefore found that notice of a duty to preserve evidence may arise when a party knows litigation is likely to result from a certain type of incident and knows that documents in its possession are relevant to that litigation. *See Stevenson v. Union Pac. R. Co.,* 354 F.3d 739, 746-48 (8th Cir. 2004); *Jorgensen v. United Commc'ns Ltd. Partnership,* 2013 WL 1726703 at *4 (D. Md. Apr. 19, 2013) (reasonable party could have foreseen litigation because record indicated awareness that improper use of confidential documents had legal ramifications). The initiation of a parallel proceeding, including a criminal investigation, may also put a party on notice of potential litigation. *Doe v. Norwalk Comm. College,* 248 F.R.D. 372, 378 (D. Conn. 2007); *see also McCargo v. Texas Roadhouse,* 2011 WL 1638992 at *4 (D. Colo. May 2, 2011) (duty to preserve evidence triggered with filing of formal internal complaint).

In *Doe,* the Connecticut federal court found that a college had a duty to preserve evidence regarding a student's alleged sexual assault as soon as deans and professors held a meeting to discuss the alleged assault – long before the victim even sent a demand letter – because the meeting showed awareness of the victim's potential claims. 248 F.R.D. at 377. In addition, the court found that a pending state criminal investigation into the sexual assault could also have placed the college on notice that all documents related to the professor may be relevant to future litigation involving him and that the school had further failed to follow its official retention policy. *Id.* at 378. *See also Byrnie,* 243 F.3d at 108 (employer arguably had notice of prospect of potential litigation when

plaintiff expressed concerns about hiring process and later served Freedom of Information Act request); *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1999) (documents could reasonably be found to be destroyed in anticipation of litigation when fear of future litigation plausibly motivated spoliation).

Here, DCSD was informed, by early April 2011, that students and parents believed that Johnson was engaged in an inappropriate, sexualized relationship with S.Z. and that the parents expected DCSD to investigate and take appropriate corrective measures.  By June 4, 2012, DCSD knew that the Sheriff's SVU was now also inquiring about Johnson and Johnson's employment in connection with S.Z. and other students.  From the time the documents were created, Defendants were under a preexisting obligation, as a result of duties imposed by federal regulation, Colorado statute, and DCSD policy, to preserve all or most of the documents addressed in this Motion. Immediately upon receiving notice of an inappropriate relationship between Johnson and S.Z., and certainly by the time that it learned of a Sheriff's Office SVU investigation into this teacher (who had recently resigned after endangering a child), DCSD and Dierberger reasonably should have anticipated future potential litigation and acted to ensure that all records regarding Johnson were properly preserved.

**B.      DCSD and Dierberger Had A Duty to Preserve Key Notes and Personnel Records Regarding Johnson's Employment.**

Under federal regulations and DCSD policy, Defendants had a duty to preserve relevant but now missing documents, including Dierberger's notes, K.C.'s written statement from April 2011, and the notes and letter from the June 2011 meeting with K.G.'s parents, as well as other relevant documents regarding Johnson's conduct and performance issues, such as his break-down

during the 2011-2012 school year and DCSD's investigation following the "child throwing incident."

29 C.F.R. § 1602.40 specifically requires a school district or individual school to preserve personnel or employment records "for a period of 2 years from the date of the making of the record or the personnel action involved, whichever occurs later."  That requirement extends to "[a]ny personnel or employment record made or kept by a school system, district or individual school" and includes any records regarding demotion or termination.  *See id.*  At least some of the records apparently lost or destroyed documented behaviors that were allegedly placed in Johnson's formal file (a letter regarding K.G.'s parents' complaints and Dierberger's notes of the March 2012 meeting), would have provided the rationale for a leave of absence in March 2012, *see* Exh. 19, or would have been used when seeking termination of Johnson's employment in March 2012.[29] Other documents, such as K.C.'s written statement, alleged Johnson's sexualized relationship with a student, which certainly should have been used in rendering employment decisions.  The documents clearly, therefore, fall within the scope of the regulation, and those documents (whether created in 2011 or 2012) should have been retained for at least two years from the date the records were made, or until well after Johnson had been criminally charged in November 2012 and S.Z. had served her CGIA notice in March 2013.[30]   Destruction of this evidence in violation of a regulation requiring its retention should give rise to a spoliation inference.  *See Hicks*, 833 F.2d at 1419, *see also Byrnie*, 243 F.3d at 108-09 (citing numerous cases).

---

[29] *See* Exh. 22; Ross Dep. Tr., Exh. 14, at 80:13-16.

[30] See Exh. 25.

In addition to the federal regulations, Colorado statute requires DCSD to create and follow its own document retention schedule.  *See* C.R.S. § 24-80-102.7 (requiring all state agencies to "[e]stablish and maintain a records management program . . . and document the policies and procedures of such program").  DCSD failed to do so here.  DCSD's own policies imposed a preexisting duty to preserve "records and information relative to compensation, evaluations, and such other information as may be considered pertinent" in the District's personnel records.  Exh. 27.  Certainly reports of sexual relationships with students, a written statement alleging sexual misconduct, notes regarding threats to a student, notes regarding breakdowns and "personal issues" warranting a leave of absence,[31] and documents regarding an investigation that leads to a forced resignation are "pertinent" records subject to preservation requirements.

Moreover, by April 2011, and certainly by no later than June 4, 2012, Defendants had a further obligation to preserve all records regarding Johnson, as they should have known that the documents might be relevant to future litigation.  By then, there had been numerous meetings regarding Johnson's inappropriate conduct toward S.Z. (and other female students), Johnson's erratic behavior and the circumstances leading to his separation from DCSD.  The Sheriff's Office SVU, which DCSD knew investigated the sexual abuse of children, had sought information about Johnson.  A duty to preserve had arisen.  *See Doe*, 248 F.R.D. at 377 (duty to preserve arose after meeting to discuss incident that later led to demand letter and lawsuit).

---

[31] *See* Exh. 19.

**C.     Defendants Had a Duty to Preserve the Disciplinary Documents Regarding K.C.'s and K.G.'s Suspensions, including K.C.'s Written Statement.**

Defendants also breached their duty to preserve relevant evidence by failing to preserve documents relevant to the April 2011 disciplinary process involving K.C., K.G., and their parents under Colorado law and DCSD policy and the reasonable anticipation of potential litigation. Defendants should have anticipated, by early April 2011 or late June 2011, following meetings with K.C. and K.G.'s parents that Johnson may have engaged in conduct that would lead to potential claims.  Certainly, the events and reports in April and June 2011, when combined with the subsequent events – such as Johnson's increasingly erratic behavior, the persistent rumors about Johnson, the child-throwing incident, and the SVU detective's inquiry – demonstrates that Defendants should have anticipated potential litigation and should have acted to preserve documents.

There was also an independent and preexisting duty to preserve the April 2011 records under state law.  In Colorado, school principals must report actions taken with respect to students who are "willfully disobedient or openly and persistently defiant…" C.R.S. § 22-32-109.1(2)(b)(IV)(E) (2014).  The statutory provision further defines "action taken" as including "in-school suspension." C.R.S. § 22-32-109.1(1)(a)(I).  While the scope of that statute is relatively limited, Defendants were under additional obligations to preserve disciplinary records concerning misconduct serious enough to warrant in-school suspensions.

Once again, DCSD also failed to comply with its state-mandated document retention schedule.  *See* C.R.S. § 24-80-102.7.  Using the Colorado State Archive's records retention schedule as guidance, DCSD specifically requires disciplinary records, which specifically includes referral and action forms, suspension documentation, statements and conferences notes (especially

18

if not entered into the computerized Infinite Campus database), to be retained for three years.[32] Additionally, under DCSD policy, the school principal, as the official custodian of the school's student records, must preserve all records concerning "teacher or counselor ratings and observations" and "reports of serious or recurrent behavior patterns." *See* Exh. 28. The District maintains these documents for cases in which a parent – presumably of either an offending student or a victim – might dispute a disciplinary action, as in the case of a suspension.[33]

Under DCSD's three-year retention policy, K.C. and K.G.'s disciplinary documents, including K.C.'s written statement, should have been retained until at least April 2014 – long after DCSD knew of a criminal investigation, begun in June 2012, and S.Z. had sent her CGIA notice in March 2013. Remarkably, by November 2012, DCSD claimed that it was not able to locate any of those records, and they had apparently also been destroyed.

**D.      Plaintiff Has Suffered Prejudice as a Result of Defendants' Failure to Preserve Patently Relevant Evidence.**

To demonstrate prejudice, the moving party must present some evidence that the destroyed evidence would have been relevant to the claims or defenses in the case. *Hermann v. Rain Link Inc.*, 2013 WL 4028759 at *3 (D. Kan. Aug. 7, 2013). "Generally, the prejudice element is satisfied where a party's ability to present its case or to defend is compromised." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011) (internal quotation omitted). "At the same time, courts must be careful that the application of this burden is not too onerous, otherwise the spoliating party might be allowed to profit from its own misconduct." *Id.*

---

[32] *See* Ross Dep. Tr., Exh. 14, at 241:4-243:2, 247:7-248:21; Exh. 29 at § 10.

[33] *See* McMinimee Dep. Tr., Exh. 13, at 221:20-222:21, 224:9-18.

In this case, S.Z. has been and will continue to be substantially prejudiced by the Defendants' failure to preserve key documentation that relates to Johnson's misconduct and notice of the substantial risk that he would sexually harass or assault her.  Defendants have previously indicated that they intend to seek summary judgment on all of S.Z.'s claims, arguing, among other things, that they lacked notice of a substantial risk that Johnson might sexually harass, abuse, or assault S.Z.  As set forth above, however, Defendants' documents relating to several instances of alleged notice have not been produced, no longer exist, and/or were consciously destroyed.  As a result, S.Z. does not have access to documents to corroborate what is likely to be disputed testimony regarding reports of Johnson's sexually inappropriate conduct with S.Z. to Defendants.

**E.      Defendants' Failures to Preserve Relevant, Material Evidence Warrants Sanctions.**

Given the circumstances, sanctions are warranted in this case.  In determining the appropriate measures, this Court has broad discretion.  The Tenth Circuit has identified several factors to consider, including the degree of prejudice to the moving party, the amount of interference with the judicial process, and the culpability of the moving party.  *Oto Software*, 2010 WL 3842434 at *14 (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992)). The sanctions may include further discovery, cost-shifting, fines, special jury instructions, preclusion, and terminating sanctions.  *Medcorp, Inc. v. Pinpoint Technologies, Inc.*, No. 08-cv-00867-MSK-KLM, 2010 WL 2500301, *1, *2 (D. Colo. June 15, 2010) (citations omitted).

**1.      S.Z. is Entitled to an Adverse Inference for Summary Judgment and for Jury Instructions.**

In the Tenth Circuit, an adverse inference instruction is an appropriate sanction where the moving party shows bad faith on the part of the non-moving party. *Turner v. Pub. Serv. Co. of*

*Colo.*, 563 F.3d 1135, 1149 (10th Cir. 2009). "Bad faith" is defined as something done "dishonestly and not merely negligently" and it "implies wrongdoing or some motive of self-interest." *Cache La Poudre*, 244 F.R.D. at 635. While it requires more than conjecture or speculation, *see id.*, direct evidence of bad faith may be unavailable in many cases, so courts have also held that circumstantial evidence may support such a finding. As one court explained, circumstantial evidence of bad faith will suffice if the following criteria are met:

> (1) evidence that once existed could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Doe v. Miami-Dade County*, 797 F. Supp. 2d 1296, 1303 (S.D. Fla. 2011) (citations omitted).

In this case, there is both direct and circumstantial evidence that the Defendants acted in bad faith in failing to preserve documents even though they knew or should have known of their legal duties to preserve those documents. Dierberger deliberately shredded her notes about the girl in the short skirt, her meeting in June 2011 with K.G.'s parents, and Johnson's erratic behavior and "personal issues." She did so several months after Johnson was forced to resign following the March 2012 investigation and many weeks after DCSD had been contacted by a Sheriff's Office SVU detective regarding Johnson and S.Z. Disciplinary records for an in-school suspension, including the written statement about which both K.C. and his father testified, are now also missing, despite state statutory requirements and a DCSD policy requiring that those documents be retained for three years. Key or "pertinent" employment records, again including K.C.'s written statement, documentation regarding Johnson's erratic behavior and "personal issues," and

21

documents regarding the March 2012 investigation are similarly missing despite legal requirements that they be kept.  The constellation of missing records is such that the SVU detective expressed concern about a cover-up by Defendants because "[a]ll the documentation seemed to have disappeared. I couldn't find a shred of evidence." Aragon Dep. Tr., Exh. 1, at 384:16-25.

S.Z. accordingly requests that the Court give the following adverse inference instructions to the jury regarding the loss or destruction of the following documents.

- The Court has found that Dierberger took notes describing Johnson's inappropriate conduct with a young girl in a short skirt in his classroom but destroyed those notes. The jury may infer that these notes document notice of Johnson's inappropriate conduct with a young, female student.  (As to Defendants DCSD and Dierberger).

- The Court has found that K.C.'s written statement, given in April 2011 when he was suspended, is missing, lost, or destroyed.  The jury may infer that this document demonstrates that K.C. was suspended for discussing an inappropriate, sexualized relationship between S.Z. and Johnson and that K.C. described in the statement the close hugging between Johnson and S.Z., the reasons he thought the relationship was sexual, and the fact that other students also believed that Johnson and S.Z had a sexual relationship. (All Defendants).

- The Court has found that Dierberger took notes of her meeting with K.G.'s parents in June 2011 but then destroyed those notes.  The jury may infer that the notes described K.G.'s parents' report that Johnson threatened K.G. for talking about his inappropriate relationship with S.Z. and their request that DCSD and Dierberger investigate the relationship to protect S.Z. (As to Defendants DCSD and Dierberger).

- The Court has found that Dierberger took notes regarding Johnson's increasingly erratic behavior and concerns regarding his break down, "personal issues" and "rumors" but destroyed those notes.  The jury may infer that those notes would have provided additional notice to Defendants DCSD and Dierberger of ongoing rumors regarding Johnson and his troubling, increasingly erratic behavior.  (As to Defendants DCSD and Dierberger),

- The Court has found that notes and records of the March 2012 investigation that led to Johnson's resignation from DCSD are lost, missing or destroyed.  The jury may infer that this investigation revealed that at least one other DCSD administrator

expressed concern over Johnson's interactions with young, female students. (As to DCSD).

Similarly, since many of the destroyed or missing documents will presumably be relevant to the issues raised in Defendants' anticipated summary judgment motion, the intentional destruction of the evidence described above should also be considered by this Court in determining that motion. In ruling on the summary judgment motion, all factual inferences must be construed in a nonmoving party's favor, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998), including those associated with the alleged destruction of evidence.

With that in mind, in *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998), the Second Circuit specifically approved the district court's "sound approach" in presuming an obligation to preserve files and intentional destruction even when, at the time of destruction, no litigation, administrative proceedings or even investigations had commenced and the government claimed that the destruction had nothing to do with a fear of future litigation. The Second Circuit agreed that because the district court could not rule out the possibility that a reasonable jury might find that the prospect of litigation played a role in the destruction of the evidence, it properly considered the government's obligation to preserve the files and intentional destruction of them when ruling on summary judgment. *Id.; see also E.E.O.C. v. Denver Newspaper Agency, LLP*, 2007 WL 485346 (D. Colo. Feb. 12, 2007) at *4 (finding that because missing notes may have contained relevant evidence and an adverse inference could impact the jury, summary judgment motion would be denied on issue); *Byrnie*, 243 F.3d at 110 (noting that potential spoliation of evidence "becomes a matter for the jury to decide" and denying summary judgment).

2.      **Even Absent a Finding of Bad Faith, S.Z. Is Entitled to Other Sanction Remedies for Loss and Destruction of Material Evidence.**

Even if this Court finds that bad faith has not been established, other sanctions as described in F.R.C.P. 37 may be imposed, including evidence preclusion, to mitigate the resulting prejudice to Plaintiff.  *See, e.g., 103 Investors I, L.P. v. Square D Company*, 470 F.3d 985, 988-89 (10th Cir. 2006) (striking testimony on cables irretrievably destroyed when extreme prejudice resulted from the destruction); *Lutalo v. Nat'l R.R. Passenger Corp.*, 2013 WL 1294125, *1, *5 (D. Colo. Mar. 28, 2013) (precluding evidence about call on destroyed cell phone); *Workman v. AB Electrolux Corp.*, No. 03-4195-JAR, 2005 WL 1896246, *1, *7 (D. Kan. Aug. 8, 2005) (expert precluded from testifying regarding cause of fire when evidence regarding other potential causes was destroyed and expert had not considered other causes).   For example, this Court may preclude Defendants from countering evidence offered by Plaintiffs concerning the content of the missing or destroyed documents, such as evidence to rebut K.C.'s testimony regarding the content of his written statement and K.C's father's testimony that McMurphy showed him the written statement the following day, when the boys arrived for their in-house suspension.

## CONCLUSION

For the reasons set forth above, S.Z. requests that this Court sanction Defendants for the spoliation of relevant, material evidence and award her all attorneys' fees and costs incurred in connection with the filing of this Motion.

Dated:  August 24, 2015                    Respectfully submitted,

                                           HUTCHINSON BLACK AND COOK, LLC
                                           By:  _/s/ Kimberly M. Hult_____
                                                 Kimberly M. Hult
                                                 Baine P. Kerr
                                                 Lauren E. Groth
                                                 921 Walnut Street, Suite 200
                                                 Boulder, CO  80302
                                                 hult@hbcboulder.com
                                                 kerr@hbcboulder.com
                                                 groth@hbcboulder.com

                                                 Craig Silverman
                                                 SILVERMAN AND OLIVAS, P.C.
                                                 1331 17th Street, Suite 510
                                                 Denver, CO 80202
                                                 silverman@silvermanolivas.com

                                                 *ATTORNEYS FOR PLAINTIFF*


                            **CERTIFICATE OF SERVICE**


        I hereby certify that on August 24, 2015, a true and correct copy of the foregoing
**PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE** was
served by CM/ECF system on the following:

Gwyneth Whalen
W. Stuart Stuller
Toni J. Wehman
Madoche Jean
CAPLAN AND EARNEST LLC
gwhalen@celaw.com
sstuller@celaw.com
twehman@celaw.com
mjean@celaw.com


                                           __s/Marlene Diamond_____
                                           Marlene Diamond

                                            25