**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-01676-MSK-NYW

SHANNON ZBYLSKI,

        Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT,
PATRICIA DIERBERGER, in her individual capacity, and
JAMES MCMURPHY, in his individual capacity,

        Defendants.

---

### ORDER ON MOTION FOR SANCTIONS

---

Magistrate Judge Nina Y. Wang

        This civil action comes before the court on Plaintiff Shannon Zbylski's Motion for Sanctions for Spoliation of Evidence ("Motion for Sanctions"). [#70, filed August 24, 2015]. Also before the court is Plaintiff's identical Motion for Sanctions for Spoliation of Evidence, filed inadvertently earlier the same day as an unrestricted document. [#66]. These Motions were referred to the undersigned Magistrate Judge pursuant to the Order of Reference dated September 12, 2014 [#16], the Reassignment dated February 10, 2015 [#32], and the respective memoranda dated August 25, 2015 [#71] and September 8, 2015 [#80]. Following careful consideration of the Motion for Sanctions and related briefing, the entire case file, the applicable case law, and the comments offered during the October 8, 2015 Motion Hearing, the Motion for Sanctions [#70] is GRANTED IN PART and DENIED IN PART and the original Motion for Sanctions [#66] is DENIED as MOOT.

# PROCEDURAL HISTORY

On June 16, 2014, Marianne Zbylski and Mark Zbylski initiated this lawsuit as parents and next friends of Shannon Zbylski[1] ("Plaintiff," "Shannon,"[2] or "Ms. Zbylski"), who was a minor at the time.  Ms. Zbylski was a student enrolled at Rocky Heights Middle School in the Douglas County School District ("DCSD") during the 2010-2011 academic year.  [#1 at ¶ 1].  She alleges:

> on several occasions during the 2010-2011 academic year and the following summer, DCSD, through Principal Dierberger, Assistant Principal McMurphy, and at least one other, high-ranking DCSD administrator, received reports from parents and students of disturbing interactions between Plaintiff, an eighth grade student, and Richard Johnson, her math teacher, including reports and rumors that a sexual relationship had developed or was developing.

[#61 at ¶ 7].  Ultimately, Richard Johnson ("Mr. Johnson") sexually assaulted Ms. Zbylski dozens of times.  [*Id.* at ¶ 8].  In 2013, Mr. Johnson pled guilty to several charges and was sentenced to serve a 20-year prison sentence, to be followed by a 20-year stint in the Colorado Sex Offender Intensive Supervised Probation Program. [*Id.* at ¶ 9].  In her Second Amended Complaint, Ms. Zbylski asserts the following claims:  (1) a violation of Title IX against the DCSD based on the sexual harassment perpetrated by Mr. Johnson; (2) a violation of her

---

[1] Originally, Shannon Zbylski was only identified by her initials, S.Z. [#1].  During the course of this action, Ms. Zbylski turned eighteen, and sought to amend the operative complaint to proceed on her own behalf.  [#55].  The court granted Ms. Zbylski's unopposed Motion to Amend, and accepted her tendered Second Amended Complaint for filing on August 13, 2015.  [#60, #61].

[2] The court would not ordinarily refer to individuals by their first name; however, because Plaintiff and some of the witnesses were minors at the time of the incidents giving rise to this action, documents or testimony often refer to these individuals by first name.  For the sake of ease of reference and to distinguish an individual from her or his parent who shared the same last name, at times the court uses an individual's first name.  The use of first names is not, and should not be construed as, a suggestion that these individuals, including Plaintiff, should be afforded any less respect than an adult or other individual proceeding before this court.

Fourteenth Amendment due process rights pursuant to 42 U.S.C. § 1983 against Defendant Patricia Dierberger ("Principal Dierberger") and Defendant James McMurphy ("Assistant Principal McMurphy") (collectively, the "Individual Defendants"); (3) a violation of her Fourteenth Amendment equal protection rights pursuant to 42 U.S.C. § 1983 against Principal Dierberger and Assistant Principal McMurphy; and (4) a violation of her Fourteenth Amendment equal protection rights pursuant to 42 U.S.C. § 1983 against DCSD. [#61].

This court entered a Scheduling Order in this case on September 18, 2014 [#23], and the case proceeded through discovery. On August 24, 2015, Defendants filed a Motion for Summary Judgment that is currently pending before the Honorable Marcia S. Krieger, the presiding judge in this matter. [#65]. Also on August 24, 2015, Plaintiff filed a Motion for Sanctions for Spoliation of Evidence [#66]. The same day, she filed an identical motion but under restriction. [#70]. Defendants filed a Response to the Motion for Sanctions on September 17, 2015 [#89], and Plaintiff filed a Reply on October 5, 2015. [#98]. Three days later, this court heard oral argument regarding the Motion for Sanctions and took the matter under advisement. [#103].

## FACTUAL BACKGROUND

The following facts are drawn from the exhibits attached to the Motion for Sanctions and the related briefing.

### Eighth Grade

During the 2010 fall semester of Plaintiff's eighth grade year, Plaintiff was a student in Mr. Johnson's math class and she helped him as a student aid. They developed a close relationship that semester. She began confiding in him and they exchanged cell phone numbers.

[#70-5 at 56:19-59:23].   During this time, rumors begin to circulate that another eighth grade student, Grace Buck ("Grace," or "Ms. Buck"), and Mr. Johnson were having sex.   Ms. Buck addressed these rumors by requesting a meeting with Mr. Johnson and three of her female teachers.   The meeting came to the attention of Principal Dierberger, who then called a meeting with Grace, Mr. Johnson, and the student they had identified as perpetuating the rumors. [#89-4 at ¶¶ 4, 5, 6].   Principal Dierberger directed the student to write apology letters to Mr. Johnson and Grace "saying that the rumors were wrong and that he was sorry."   [#70-4 at ¶ 6].   Nothing in the record associated with this instant motion suggests that any rumors were circulating as to Plaintiff's contact with Mr. Johnson during this time period, nor does it appear that Defendants conducted any type of investigation into Mr. Johnson's behavior at this time.

By the spring of 2011, Mr. Johnson and Plaintiff were speaking on the phone with each other regularly.   He initiated a "question game" with her, where he would pose questions such as whether she was attracted to him, and whether she would date him if he was her age.   The questions made Plaintiff uncomfortable and after a few weeks she asked him to stop.   [#70-5 at 78:25-80:3].   They eventually resumed the game at her request.   [*Id.*]      Also in the spring of 2011, rumors begin to circulate at Rocky Heights Middle School that Plaintiff and Mr. Johnson were having sex.   Grace attested that these rumors went beyond the rumors the previous semester concerning her, and that "[i]t was obvious to students that there was something off about Mr. Johnson and Shannon's relationship and that it was more than a teacher/student relationship."   [#70-4 at ¶ 9].   Grace further attested that Mr. Johnson and Plaintiff "seemed to tell each other everything, would walk alone through the halls together, and behaved as if they were very comfortable and close with each other."   [*Id.*].   These rumors continued all spring.   [#89-4 at ¶

4

8].  The rumors extended to Plaintiff "having sex with Mr. Johnson," that "[she is] f***ing [her] teacher," and that "Mr. Johnson is creepy."  [#89-2 at 121:20-22].[3]

Mr. Johnson knew these rumors were circulating, recognized it was stressful for Plaintiff, and apologized to her.  [*Id.* at 121:8-18].  When Plaintiff's friend, Sheridan, informed her about the rumors, Plaintiff asked Sheridan to accompany her to Defendant McMurphy's office to make a report.  Plaintiff testified that she approached Assistant Principal McMurphy because "[the rumors] were about [her], and a pretty hefty thing for people to be saying and a lot of people were talking about it, so [she] felt like an administrator should know about it."  [#89-2 at 130:14-131:24].  She further testified, "I told Mr. McMurphy right afterwards, and he's an adult, and he was in the school when it was happening. It was an issue within the school and he was the person I felt most comfortable going to for the certain situation."  [*Id.* at 132:1-5].  Plaintiff identified two fellow eighth grade students, Keith Coleman ("Keith") and Kyle Gross ("Kyle"), as responsible for perpetuating the rumors. Plaintiff testified that Assistant Principal McMurphy said he would "take care of it."  [#89-2 at 131:21-24].  There is no indication from the record that Defendant McMurphy asked either Plaintiff or Mr. Johnson any questions about the truth of any rumors, or that Defendants conducted any type of investigation into Mr. Johnson's behavior at that time other than speaking to Keith and Kyle.

Defendants McMurphy and Dierberger called Keith and Kyle into the office.  Kyle testified that Mr. Johnson was present when he entered Principal Dierberger's office, that Principal Dierberger asked Kyle if he was responsible for rumors regarding Mr. Johnson and

---

[3] When citing deposition testimony, the court uses the page and line references in the original deposition transcript, so that such references are consistent with those used by the Parties in the briefing.

Plaintiff, and then stated, "that is sexual harassment towards a teacher. So we will have to punish you with in-school suspension."   [#70-9 at 117:15-118:11].   Keith testified that Defendant McMurphy saw him first, and told him he was in trouble for spreading rumors about Mr. Johnson and Plaintiff. [#70-10 at 74:16-19].   Kyle testified that at the time he and Keith were called to the office, "everyone" in their class was talking about Mr. Johnson and Plaintiff at "anytime." [#70-9 at 123:18-124:1].   The students were gossiping that "it is weird how they text each other, how they're always together, how he's hugging on a student."   *[Id.* at 124:21-25]. Kyle also heard around that time that Mr. Johnson and Plaintiff were together often outside of school and that Mr. Johnson had a picture of Plaintiff on his desktop.  [*Id.*]  Kyle testified that he denied telling sexual jokes about Plaintiff or any other female student and Mr. Johnson, but told Defendant Dierberger that he felt "it's kind of weird how they were hanging out with each other all the time," and "it's weird how everyone is talking about it, the rumors." *[Id.* at 129:18-131:4].  Kyle also testified that Defendant Dierberger asked him if he had seen anything physical occur between Mr. Johnson and Plaintiff, and Kyle responded that "they have been hugging and talking to each other very closely and flirtatious."  *[Id.* at 173:7-14].   Keith testified that after arriving in Defendant Dierberger's office, she explained to him that certain students had reported to Mr. Johnson overhearing Keith and Kyle "saying sexual stuff" about Mr. Johnson and Plaintiff.  [#70-10 at 49:8-19].   Keith also testified that "the whole school was basically" discussing the same observations regarding Mr. Johnson and Plaintiff, and that he felt the "school should have known more about it.  They should have dove into it better...investigated it better."  [#70-10 at 20:2-25].  Defendants asked Keith and Kyle to write statements regarding their involvement with the rumors.   Keith wrote that he and Kyle "joined a huge group of

boys…that were talking about…Shannon and Johnson and [he] added [his] remarks to…what everybody was saying, basically joined in the conversation." [#70-10 at 54:3-9]. He also wrote that Mr. Johnson had pictures of Plaintiff on his classroom computer and that students thought that Mr. Johnson and Plaintiff were having sex. [#70-10 at 76:15-19, 77:19-23]. Defendants disciplined the boys with in-school suspensions, though Principal Dierberger vacated the suspension and returned the boys to their classes later during the day. [#70-11 at 201:1-4, 240:22-25]. Again, there is no indication that Defendants investigated Mr. Johnson or his alleged behavior at that time, or alerted Plaintiff's parents of the rumors.

Keith's father, Keith Coleman Sr., a police officer, drove to the middle school the following day to contest the suspension and he met with Defendant McMurphy, who showed him the boys' statements. [#89-12 at 28:5-11]. Mr. Coleman pressed Defendant McMurphy on how his son's behavior was so inappropriate as to warrant suspension, in particular when none of the other boys involved, other than Kyle, was disciplined. [*Id.* at 28:14-29:16]. He spoke with Defendant McMurphy about "looking into this matter," saying "for [his] son to serve a day or two of suspension in-house is nothing compared to Shannon being violated." [*Id.* at 30:2-32:2]. Mr. Coleman also testified that he spoke with Defendant Dierberger on the phone, and she told him that the incident had been investigated. [*Id.* at 29:4-11]. Assistant Principal McMurphy admitted that they had not spoken to Plaintiff's parents about the rumors and had not spoken to Mr. Johnson; Mr. Coleman asked Defendant McMurphy to follow up with him regarding an investigation of the rumors. [*Id.* at 30:13-23]. The following week, Mr. Coleman called Defendant McMurphy asking for an update. He testified that Defendant McMurphy responded, "Oh, it checks out okay." [*Id.* at 31:5-10].

Kyle Gross's mother also requested a meeting to discuss the suspension of her son, and met with Defendant Dierberger.  Mrs. Gross testified that during their meeting, Defendant Dierberger was protective of Mr. Johnson and asserted that he was a "good person on her staff." [#89-6 at 89:25-90:8].  Mrs. Gross testified that Defendant Dierberger said, "I know Rick Johnson, and that's all I need to know. I know my staff."  [*Id.*].  Mrs. Gross sensed that Defendant Dierberger was defensive with regard to Mr. Johnson and unwilling to consider the possibility that he was sexually assaulting Plaintiff.  [*Id.* at 92:11-15].  Mrs. Gross told Defendant Dierberger to take the rumors seriously and to investigate them.  [*Id.* at 92:16-20]. She testified that she essentially pleaded with Defendant Dierberger to ensure that "all these kids are not lying," and to "make sure this is not happening to this little girl."  [*Id.* at 93:7-94:3].  She also testified that she felt that Defendant Dierberger "wasn't listening" and that Defendant Dierberger "just kept talking about what a nice person [Mr. Johnson] was and that she could not have Kyle making these types of accusations in the school."  [*Id.* at 97:10-16].   During this meeting, Mrs. Gross shared that in December 2010, the previous winter, she had listened to her son talking to two of his friends about Plaintiff and Mr. Johnson.  The boys' observations caused Mrs. Gross, in her professional experience as a social worker, to wonder if Mr. Johnson was grooming or had already begun sexually assaulting Plaintiff.  [#89-6 at 88:4-22].  After the initiation of this lawsuit, Defendant Dierberger testified that she did not hear Keith or Kyle "say that there was something going on between [Plaintiff] and Richard Johnson," during the incident when they received in-school suspensions.  [#70-6 at 213:20-25].

Mr. Johnson kissed Plaintiff for the first time between the end of April and the beginning of May, and thereafter began kissing her regularly at Rocky Heights Middle School in private.

[#70-5 at 80:4-16].  By the end of the school year the rumors circulating about Mr. Johnson and Plaintiff had not dissipated, and indeed had escalated to the point that Defendant McMurphy addressed the class with regard to the gossip and declared that their behavior was the worst he had seen; he demanded that the rumors and bullying stop.  [#70-4 at ¶ 11].  Grace attested that everyone "knew that Mr. McMurphy was referring to the rumors regarding Mr. Johnson, especially the rumors about what seemed like an inappropriate relationship between Mr. Johnson and Shannon."  [*Id.*].  Defendant McMurphy left Rocky Heights Middle School at the end of the 2011 school year to become principal at Ranch View Middle School.  [#89-1 at 32-33].

### Summer Before Ninth Grade

Mr. Johnson's relationship with Plaintiff escalated during the summer after she completed her eighth grade year and left Rocky Heights Middle School.  Plaintiff testified that she often spent time with Mr. Johnson at his home while his wife was at work, and that she saw him every day that summer.  [#70-5 at 85:19-87:19].  In addition, the relationship had turned sexual.  [*Id.* at 233:8-18].  Over the 2011 Memorial Day Weekend, Mr. Johnson aggressively confronted Kyle at the Southridge Recreation Center for "running his mouth" about Mr. Johnson and Plaintiff.  Kyle returned home afterwards and told his mother, Mrs. Gross, who immediately requested a meeting with Defendant Dierberger and Dierberger's supervisor.  [#70-12 at 100:10-101:21].  Mrs. Gross also consulted an attorney.  At the meeting, Mrs. Gross asked again about the well-being of Plaintiff, to which Defendant Dierberger responded, "it was going to be investigated."  [*Id.* at 104:1-7].  Mrs. Gross testified that the supervisor who was present, whose name she could not remember, similarly represented that "he was going to get a letter in his file." [*Id.*].  Plaintiff testified that Mr. Johnson told her Principal Dierberger had called him and told

9

him that he needed to be careful and "couldn't be doing things like that," referring to the confrontation between Mr. Johnson and Kyle at the recreation center.  [#70-5 at 235:3-236:1].

During her deposition, Defendant Dierberger disagreed that Mrs. Gross said anything to her at that meeting regarding an inappropriate relationship between Plaintiff and Mr. Johnson, or that Mrs. Gross voiced her concerns regarding Plaintiff and Mr. Johnson.  [#70-6 at 249:18-250:5].  Defendant Dierberger did not remember whether a supervisor was present at this meeting, but acknowledged that Terry Killin was often present at meetings such as those.  [*Id.* at 251:3-252:6].  While he was included on an email arranging the meeting [#98-10], Mr. Killin retired a matter of days after this meeting took place, and could not recall during his deposition whether he attended the meeting.  [#89-28 at 145:18-25, 150:15-151:5].  Defendant Dierberger testified that she "normally" would take notes at a meeting like this and place those notes in her personal file.  [#70-6 at 250:16-251:2].

<u>Freshman Year of High School</u>

Defendant Dierberger testified that during the fall of 2011, she became concerned about Mr. Johnson's behavior.  [#70-6 at 50:4-21].  She testified that she raised her concerns with him, and she "probably" would have documented these conversations in notes she kept in her personal file.  [*Id.* at 50:4-21; 50:22-51:22; 83:10-16].  However, it does not appear that Defendant Dierberger or Defendant DCSD undertook an investigation into Mr. Johnson's relationship with Plaintiff at that point, and Ms. Zbylski was no longer a student at Rocky Heights Middle School.

In December 2011, Plaintiff told Mr. Johnson that she would report their relationship if he did not leave his wife within the following two months.  [#89-2 at 59-62].  By this point Mr. Johnson had begun sexually assaulting Plaintiff.  [#89-15 at 11, 13].  Mr. Johnson left his wife in

January 2012.  [#89-2 at 59-62].  All the while, the sexual assault of Plaintiff by Mr. Johnson continued.  [#89-15 at 15-16].

In February 2012, Mr. Johnson contacted Defendant Dierberger through email thanking her for checking on him and explaining that he is "dealing with many things with very few answers and lots of frustrations."  [#89-20].  He expressed significant frustration with the "many people who are talking about me and spreading things when I have spoken very little about any of this."  [*Id.*].  He then wrote he hoped she understood "that I am very stressed and instead of knowing what is going on, I am hearing more that rumors/gossip are being spread."  [*Id.*].

In March 2012, a student recorded Mr. Johnson laughing during a recess period while watching some of his students throw another student into the air to fall to the ground.  Later that month, at a meeting called with Defendant Dierberger, a human resources director, and a union representative to discuss the incident, Mr. Johnson agreed to resign rather than be discharged.  [#22].  Defendant Dierberger testified that she would have placed in an "official folder" any notes she took during this meeting; no such notes have been produced. [#70-6 at 83:17-23].  There is also no indication in the record before this court that Defendants undertook any investigation of Mr. Johnson's relationship with Plaintiff—despite assurances provided to Mr. Coleman, Mrs. Buck, or Mrs. Gross.

<u>Summer Following Freshman Year and Beginning of Sophomore Year</u>

In June 2012, an acquaintance of the Zbylskis, Linda Peterson, contacted the Douglas County Sheriff's Office to report concerns that Mr. Johnson was sexually assaulting Plaintiff.  [#89-15 at 4].  Mr. Johnson had coached Ms. Peterson's son in basketball, and there had been talk amongst the parents of the boys who played basketball for Mr. Johnson that he was involved

in an inappropriate relationship with Plaintiff.[4]  *Id.*  In response to this report, a detective with Douglas County's Special Victims Unit, Dea Aragon, contacted DCSD inquiring about Mr. Johnson and three other students, including Plaintiff.  [#89-15 at 4; #70-1 at 5].  Detective Aragon spoke over the phone with then-DCSD security manager, Mark Knapp.  Mr. Knapp knew Detective Aragon was a member of the Special Victims Unit and that the Unit had initiated an investigation.  [#70-1 at 123:20-124:5].  Detective Aragon did not speak to any other administrators at that time.  [*Id.*]  Only Detective Aragon's notes of the correspondence exist; Mr. Knapp has since left DCSD, and the evidence is unclear whether Mr. Knapp made notes of the correspondence or relayed Detective Aragon's inquiry to others at DCSD.  [#70-1 at 123:20-124:24].  Mr. Johnson's employment with DCSD formally ended days after Detective Aragon contacted the school.  [#23].  At that time he was involved in divorce proceedings with his wife.

On June 7, 2012, Detective Aragon conducted a forensic interview with Plaintiff that was recorded on video.  [#89-15 at 7].  Plaintiff denied having a sexual relationship with Mr. Johnson and represented that they had not had a close relationship since December 2011.  [*Id.* at 8].  The interview lasted approximately 45 minutes; at its conclusion, Detective Aragon told Plaintiff she did not think Plaintiff was "telling [her] the whole story, and that [she] know[s] there is more going on."  [*Id.* at 10].  Detective Aragon also told Plaintiff that "when she is ready to talk about it [she] want[s] [Plaintiff] to tell her mom."  [*Id.*]

Ms. Dierberger retired from DCSD on June 30, 2012.  Several weeks later, Mr. Johnson ended his relationship with Plaintiff.  He told her that "it was getting too risky…[h]e couldn't do it anymore…[p]eople were getting curious…people were getting suspicious."  [#89-2 at 200:15-

---

[4] Keith Coleman and Kyle Gross were also members of this basketball team.

23; #89-15 at 18].  Plaintiff testified that she was hurt by the break-up, and that "[Mr. Johnson] never let me hang out with my friends, he never let me open up to my parents…[s]o he was all that I had."  [#89-2 at 200:24-201:4].  Plaintiff confided in her mother shortly thereafter but "begged" her mother not to tell her father, because she "knew [her] dad would want to go to the police right away, and [she] did not want that happening..."  [*Id.* at 201:13-203:19].  She testified that she felt "really alone" and that she thought "the people in my family probably picked up on my mood as I was really sad."  [*Id.* at 73-75].  Plaintiff also testified that she "was just in such a bad place, and the last thing I wanted to do was deal with the loss of [Mr. Johnson] and deal with kids at school."  [*Id.* at 203:17-19].

On October 14, 2012, Plaintiff and her mother told her father about the relationship with Mr. Johnson.  [#89-17 at 148:16-23; #89-15 at 28].  Plaintiff testified that she and her mother "couldn't hold it any longer…[i]t was too hard and it was too much."  [#89-2 at 203:22-25].  On October 17, 2012, Plaintiff's parents took her to the Douglas County Sheriff's Office for Plaintiff to report her relationship with Mr. Johnson.  [#89-15 at 11].  On November 13, 2012, the police arrested Mr. Johnson.

<u>Records at Issue</u>

Administrators at Rocky Heights Middle School maintained an official file for each teacher.  These files were kept in the school's main office.  [#70-6 at 48:5-7, 49:10-12].  Defendant Dierberger testified that if she noted a pattern of behavior with a certain teacher, her practice was to place a copy of her notes regarding the behavior in the teacher's official file.  [*Id.* at 44:10-45:2].  Copies of annual teacher evaluations were stored in these files, along with "[a]nything that's official…because a teacher had the right to look at anything that was in their

file." [*Id.* at 47:22-48:4]. Defendant Dierberger stated that she would have included in Mr. Johnson's teacher evaluation any pattern of behavior or concerns that she had observed. [*Id.* at 49:13-21]. However, in the 2011-2012 school year evaluation of Mr. Johnson, Defendant Dierberger noted no concerns about Mr. Johnson and rated him as "highly effective." [*Id.* at 145:6-146:22, 147:21-148:8]. Defendant Dierberger testified that she did not note in Mr. Johnson's official file the incident between Mr. Johnson and Kyle Gross at the recreational center during the summer of 2011, or the subsequent meeting with Mrs. Gross. [*Id.* at 255:23-256:11]. The only document produced during discovery related to this meeting was the e-mail arranging the meeting, which included Terry Killin. [*Id.* at 255:23-256:20, 258:1-10; #98-10]. In addition, at the time of this litigation, the disciplinary record regarding Keith Coleman's in-school suspension in relation to Plaintiff and Mr. Johnson was not in Keith's file, although the file contained records of other disciplinary action Keith had incurred. [#70-6 at 197:1-25].

While principal at Rocky Heights Middle School, Defendant Dierberger also "made a habit of taking notes," and she would place her notes in her personal file that she kept in her desk. [#70-6 at 44:9]. These notes pertained to her interactions and/or concerns with teachers, parents, and students, alike. When questioned whether she took notes regarding Mr. Johnson, Defendant Dierberger testified that she "probably" placed a note in her personal file regarding Mr. Johnson's casual dress and her concerns regarding his behavior in fall of 2011. [*Id.* at 50:4-21].

In addition, prior to his separation from employment, Defendant Dierberger discovered Mr. Johnson alone in his classroom with a young female student sitting on his desk, wearing a short skirt, and facing him. [*Id.* at 131:6-20]. Defendant Dierberger testified that she either

noted the incident in her personal folder, or "hope[d]" that she would have noted it. [*Id.* at 132:18-25]. Soon after Defendant Dierberger retired, she shredded all of her personal files by hand at her home on the basis that she "[h]ad no need [for them]." [*Id.* at 45:7-12, 46:3-9]. She could not remember the date on which she shredded her files, but suggested sometime in May or June 2012. [*Id.* at 45:11-18, 46:10-15]. She could not recall whether her personal file contained notes about Mr. Johnson, and testified that her personal file contained no notes as to Plaintiff or Kyle Gross. [*Id.* at 46:16-47:6]. She recalled shredding notes pertaining to meetings or interactions with parents that she had stored in a "collected big folder." [*Id.* at 85:14-86:10]. To Defendant Dierberger's knowledge, all teacher files maintained in the school were intact at the time of her retirement [*id.* at 48:5-7, 49:10-12], including the file on Mr. Johnson. [*Id.* at 90:5-11].

During discovery, Plaintiff sought from Defendants documents related to their knowledge of and actions attributed to Mr. Johnson and learned that apart from a lone email, no disciplinary records exist as to the in-school suspension of Keith Coleman and Kyle Gross arising from the rumors regarding Mr. Johnson and plaintiff; no notes exist from Defendant Dierberger's meetings with students, parents, or Mr. Johnson; no copy exists of a written statement made by Keith regarding Mr. Johnson's behavior toward Plaintiff; and no notes exist regarding any investigation of Mr. Johnson that led to his resignation. [#70 at 7-12]. On March 13, 2013, Plaintiff's counsel sent a notice under the Colorado Government Immunity Act to Defendant DCSD regarding potential claims. [#70-25]. DCSD issued its first litigation hold letter on August 28, 2013. [#70-26]. Plaintiff now contends that Defendants were informed, no later than April 2011, that students and parents believed that Mr. Johnson "was engaged in an

inappropriate, sexualized relationship with [Plaintiff] and that the parents expected DCSD to investigate and take appropriate corrective measures," [#70 at 15], but nonetheless failed to preserve, or destroyed, documents that they had a duty to preserve and produce.

## ANALYSIS

The Federal Rules of Civil Procedure provide for discovery procedures that seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information. *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 619 (D. Colo. 2007) (citation omitted). To accomplish these objectives, Rule 26(b) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense" or discovery of any information that "appears reasonably calculated to lead to the discovery of admissible evidence," so long as it is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).[5] So as to protect each party's ability to participate in the expansive discovery permitted by Rule 26(b)(1), putative litigants have a duty to preserve documents that may be relevant to pending or imminent litigation. *Cache La Poudre Feeds*, 244 F.R.D. at 620.

"Spoliation" results from "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable

---

[5] The recent amendment to Federal Rule of Civil Procedure 26(b)(1), effective December 1, 2015, reads "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Pursuant to 28 U.S.C. § 2074(a) and the Order of the Supreme Court dated April 29, 2015, the amendment shall govern all civil cases commenced after December 1, 2015 and "insofar as just and practicable, all proceedings then pending."
*See* http://www.supremecourt.gov/orders/courtorders/frcv15(update)_1823.pdf.

litigation." *Oto Software, Inc. v. Highwall Technologies, LLC*, No. 08–cv–01897–PAB–CBS, 2010 WL 3842434, at *7 (D. Colo. August 7, 2010) (citing *West v. Goodyear Tire & Rubber, Co.,* 167 F.3d 776, 779 (2d Cir. 1999)).  As a general rule, the trial court acts with discretion in imposing sanctions for abuse of discovery under Rule 37, *Coletti v. Cudd Pressure Control,* 165 F.3d 767, 777 (10th Cir. 1999) (internal quotation marks and citation omitted), and the court has inherent power to impose sanctions for the destruction or loss of evidence.  *Cache La Poudre Feeds*, 244 F.R.D. at 620 (citations omitted).

Plaintiff seeks sanctions pursuant to Rule 37(b) and (c) in the form of an adverse inference for summary judgment and jury instructions and, in the alternative, for evidence preclusion, on the basis that Defendants failed to disclose and indeed destroyed written evidence of their notice "of the potential that Johnson would sexually harass or assault [Plaintiff]," after they had a duty to preserve all relevant evidence and in contravention of federal regulations, state laws, and DCSD policies.  [#70 at 3].  Plaintiff identifies the missing written evidence as follows:

- Principal Dierberger's handwritten notes of Johnson's inappropriate conduct with a young girl in a short skirt in his classroom in 2010 or earlier;
- Disciplinary documents regarding two students who reported an inappropriate, sexualized relationship between Plaintiff and Johnson to Dierberger and McMurphy in April 2011, and who were consequently suspended for "disruptive" conduct;
- At least one written statement by one of those students, prepared in April 2011, that described Johnson's troubling, inappropriate, and sexualized conduct toward Plaintiff and the widespread belief that the relationship had turned sexual;
- Principal Dierberger's handwritten notes from a meeting with parents of one of those students in June 2011, where they described Johnson's threats to their son for reporting Johnson's disturbing and sexualized relationship with Plaintiff and then asked Dierberger to investigate the rumors of Johnson's inappropriate relationship with Plaintiff;

- Principal Dierberger's notes regarding Johnson's increasingly erratic behavior and her concerns about his "personal issues" and response to "rumors" in 2011-2012, during the time that Johnson was assaulting Plaintiff; and
- Notes and documentation created during a March 2012 DCSD investigation after Johnson was observed engaging in conduct physically endangering another RHMS student, during which another DCSD administrator expressed concerns regarding Johnson's interactions with young, female students.

[#70 at 3-4].    Defendants concede that such notes and records would be relevant to the pending litigation and that they have not been produced, but argue that there exists questions as to whether the following notes even existed:

- Records of a conversation that Ms. Dierberger had with Johnson cautioning him about letting a female student who was wearing a short skirt sit on his desk;
- Notes of an incident when Ms. Dierberger required a student to write a letter of apology to Johnson and Grace Buck, his classroom aide, after Ms. Buck complained that the student had been spreading rumors that she was having sex with Johnson;
- Notes of a meeting with Kyle Gross's parents in June 2011; and
- Notes regarding Johnson's behaviors and his complaints about rumors after he left his wife.

[#89 at 12].  Defendants argue that Principal Dierberger testified "that it was her habit to take notes, not that she actually did take notes of each incident," *id.*, but nonetheless brief these issues with regard to spoliation.  Defendants further contend that they had no duty to preserve this written evidence, even assuming it existed, because they did not and could not have known about the sexual relationship between Plaintiff and Mr. Johnson until at least October 2012, in part because Plaintiff was actively hiding such information and the Zbylskis did not report the assaults to the police until October 14, 2013.  [#89].  Defendants also argue that even if such evidence had been unwittingly destroyed, it was done without bad faith and any prejudice to Plaintiff is entirely speculative.  [*Id.* at 20].

## I.      Existence of Documents

This court first considers Defendants' arguments that there is no conclusive evidence that the documents at issue ever existed.   A moving party has the burden of proving, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it.   *See Ernest v. Lockheed Martin Corp*, No. 07-cv-02038-WYD-KLM, 2008 WL 2945608, *1 (D. Colo. July 28, 2008).   Some courts within the Tenth Circuit have declined to engage in a substantive spoliation analysis when a party fails to first establish the existence of the documents at issue.   *See e.g.*, *Kincaid v. Wells Fargo Securities LLC*, No. 10-cv-808-JHP-PJC, 2012 WL 162349, *2 (N.D. Okla. Jan. 19, 2012).   Courts have found, and this court agrees, that a party seeking spoliation sanction must offer some evidence that relevant documents have been destroyed.   *See Oldenkamp v. United Am. Ins. Co.*, No. 07-cv-601-TCK_PJC, 2008 WL 4682226, *2 (N.D. Okla. Oct. 21, 2008).

Despite Defendants' arguments to the contrary, this court concludes that based on the record, it is more likely than not that relevant documents have been destroyed.   As an initial matter, there is no dispute that disciplinary documents related to Keith Coleman and Kyle Gross arising from what each said about Mr. Johnson and Plaintiff's relationship existed at one point and have not been produced.   [#89].   Those documents are relevant, particularly given the fact that Kyle testified that he told Principal Dierberger he had seen a picture of Plaintiff on Mr. Johnson's computer and that he had witnessed Mr. Johnson and Plaintiff hugging and talking very closely and flirtatiously.   [#70-9 at 173:1-174:12].   Defendants also do not dispute that there was at least one written statement by Keith Coleman involving the circumstances that led to his in-school suspension.   [#89].   Keith testified that Defendant McMurphy had given him a

statement sheet to fill out, and that he had included in his statement that students thought that Plaintiff and Mr. Johnson were having sex.   [#70-10 at 53:16-25; 76:15-19].   Indeed, Mr. Coleman testified that upon meeting with Defendant McMurphy, he was shown two statements, one written by his son, Keith, and one written by Kyle Gross.  [#89-12 at 28:5-11].

In addition, based on the totality of the record before me, I conclude that there were handwritten notes from the meeting between Kyle Gross's parents, Defendant Dierberger, and an unnamed supervisor.   In reaching this conclusion, the court relies on a document that corroborates a third person's involvement in the meeting and the testimony of a third party witness who has no apparent interest in the outcome of this action.  First, the record is clear that a meeting was scheduled with the Grosses, Defendant Dierberger, and Terry Killin.  [#98-10]. While Defendants may dispute whether Mr. Killin ultimately attended that meeting, Mrs. Gross, the mother of Kyle Gross, unequivocally testified that an administrator was present at the meeting and that the administrator took notes.  [#70-12 at 103:18-23, 142:8-18].  She further testified that the administrator told her that her concerns about an inappropriate relationship between Mr. Johnson and Plaintiff would be investigated and a letter would be placed in Mr. Johnson's file.  [*Id.* at 143:24-144:14].  Kyle Gross also testified that his mother told him at the time that "[t]his is going into his teacher file." [#70-9 at 176:21-177:6].  Neither the notes of the meeting nor any letter from Mr. Johnson's personnel file have been produced.

With respect to any handwritten notes taken by Principal Dierberger regarding Mr. Johnson's inappropriate conduct with his female students, including notes regarding the student sitting on Mr. Johnson's desk, the court similarly concludes based on the circumstantial evidence that such notes did, at one time, exist.  First, as Defendants concede, Principal Dierberger

testified that she "made a habit of taking notes" if issues arose with teachers.  [#70-6 at 44:5-9].

In fact, Principal Dierberger testified that it was her normal habit to take notes at a meeting with parents [*id.* at 281:19-282:10] and to generate and maintain notes about teachers, including Mr. Johnson [*Id.* at 281:11-18].  Second, third party witnesses testified to telling Principal Dierberger about inappropriate behavior between Mr. Johnson and Plaintiff.  Kyle Gross testified that Defendant Dierberger specifically asked him if he had seen anything physical transpire between the two, and that he told her "they had been hugging and talking to each other very closely and flirtatious." [#70-9 at 173:7-18].  Mrs. Gross testified that she raised the issue of Mr. Johnson's inappropriate relationship with Plaintiff to Principal Dierberger as of April 2011.  [#89-6 at 86:22-87:5; 92:16-29].  Third, Principal Dierberger further testified that she "probably" had notes in her folder about Mr. Johnson because she was concerned about his behavior starting in the beginning of 2011. [#70-6 at 50:4-21].  When asked, Principal Dierberger did not identify just one concern about Mr. Johnson, but recited a list of concerns: he was dressed inappropriately; he always appeared to be anxious; his back was always hurting; his life was not good; he was on his cell phone inappropriately; his quality of instruction was not up to par because his CSAP scores were declining; he was late or he would leave school quickly because he had to coach basketball at the high school; and he missed meetings that Principal Dierberger needed him to attend.  [*Id.* at 50:22-51:19].  She also testified that she sent him home for a rip in his jeans during the 2011-2012 school year; he had a "major meltdown" at an in-service on or about March 2, 2012; and she had Mr. Johnson speak with her and a psychologist. [*Id.* at 129:11-24, #89-1 at 152:2-5].  Principal Dierberger further testified that she spoke with him about the issues that she identified. [#70-6 at 51:20-22].  She specifically testified that she herself had observed in his classroom a

female student wearing a short skirt, sitting on his desk facing him, and that she reprimanded him for that incident. [*Id.* at 129:25-131:20]. And while Principal Dierberger could not be absolutely certain she made a note in her file about observing the student sitting on Mr. Johnson's desk, her initial reaction was that she was "sure" she would have made such a note. [*Id.* at 132:18-25]. In addition, Dan McMinimee, the former Assistant Superintendent of DCSD for secondary education testified if a teacher was disciplined, a note should be made of that and put in the file. [#70-13 at 221:12-19; 222:6-15]. Standing alone, each of these facts individually might not lead the court to the conclusion that there were relevant handwritten notes; taken together, however, this court concludes that there is sufficient circumstantial evidence that relevant documents once were, but are no longer, in existence.

Finally, the court considers whether notes and documentation created during an investigation leading to Mr. Johnson's resignation were destroyed. For this category of documents, there is insufficient evidence in the record before the court on this instant motion to conclude additional documents existed and have not been produced. It appears that Principal Dierberger testified that she did not conduct a further investigation of the incident during the recess period because she had seen the video and that was sufficient. [#89-1 at 161:1-9]. Even considering the note reflecting "investigation follow-up regarding Rick Johnson," [#70-20 at 2], Robert Ross, Jr. testified that a further investigation was not conducted because Mr. Johnson decided to separate from DCSD. [#98-11 at 81:6-16]. Therefore, on the record before it and for the purposes of this instant motion only, this court does not find that Plaintiff has established by a preponderance of the evidence that additional notes and documentation with regard to Mr. Johnson's resignation were created in March 2012 and subsequently destroyed.

Having found that documents existed that have not been maintained and produced, and noting that Defendants do not dispute the relevance of such potential documents, the court now turns to consider whether, and when, Defendants were under any duty to preserve the information.

## II.     Duty to Preserve

### A.     *Common Law*

#### 1.     Applicable Law

Under Tenth Circuit law, spoliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was "imminent," and (2) the adverse party was prejudiced by the destruction of the evidence. *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009) (internal quotation and citation omitted). As an initial matter, the Parties disagree about what constitutes "imminent" litigation that triggers Defendants' duty to preserve.

Plaintiff argues Defendants' duty to preserve was triggered when they had notice or should have known that evidence "may be relevant to potential future litigation." [#70 at 13 (citing *Cache La Poudre Feeds*, 244 F.R.D. at 620)]. Defendants assert in their Response, and at oral argument urged this court to accept, that their duty to preserve did not arise before this *specific* litigation was "pending or imminent." [#89 at 15 (citing *Cache La Poudre Feeds*, 244 F.R.D. at 630)]. Defendants argue, "[o]bviously, [they] could not have known of imminent litigation before they became aware of the sexual relationship itself." [#89 at 3].

This court respectfully rejects the notion that a party's obligation to preserve information arises only after it understands the *precise* nature of the *specific* litigation at issue. Courts in this

District have found that putative litigants had a duty to preserve documents once a party has notice[6] that the evidence is relevant to litigation or when a party knew or should have known that the evidence may be relevant to future litigation. *Cache La Poudre Feeds*, 244 F.R.D. at 620*; Asher Associates, LLC. v. Baker Hughes Oilfield Operations, Inc.*, No. 07–cv–01379–WYD– CBS, 2009 WL 1328483 (D. Colo. May 12, 2009)) (citing *Zubulake*, 220 F.R.D. at 216).  The most recent amendments to Rule 37(e) of the Federal Rules of Civil Procedure are consistent with this notion, in the context of preserving electronically stored information:

> In applying the rule, a court may need to decide whether and when a duty to preserve arose.  Courts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant.

Advisory Committee Notes to Fed. R. Civ. P. 37(e) (eff. Dec. 1, 2015).

As a court in this District explained, while "the duty to preserve evidence is often triggered by the filing of a lawsuit…, this duty may arise earlier if a party 'knows or should have known' that the material may be relevant to future litigation." *Oto Software, Inc.*, 2010 WL 3842434, at *7 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (the obligation to preserve evidence arises when a party should have known) *overruled on other grounds by Rotella v. Wood,* 528 U.S. 549 (2000)).[7]  In determining whether a party's duty to

---

[6] A survey of cases from across the country indicates that courts almost uniformly instruct that "notice" is the trigger point for the duty to preserve. *See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001) (holding the duty to preserve "usually arises when a party has notice that the evidence is relevant to litigation"); *Procter & Gamble Co. v. Haugen*, 179 F.R.D. 622, 631 (D. Utah 1998) (recognizing a court's inherent power and authority under Fed. R. Civ. P. 37(b)(2) to sanction a litigant "who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information"), *judgment aff'd in part and rev'd in part on other grounds*, 222 F.3d 1262 (10th Cir. 2000).

[7] *See also F.D.I. C. v. Malik*, No. 09–CV–4805, 2012 WL 1019978, at *1 n. 1 (E.D.N.Y. March 26, 2012) (finding  that duty to preserve arose  when attorneys who allegedly destroyed

preserve has been triggered, courts evaluate facts such as the likelihood that a certain kind of incident will result in litigation; the knowledge of certain employees about threatened litigation based on their participation in the dispute; or notification received from a potential adversary. *See Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004) (finding defendant railroad had a duty to preserve dispatch recordings because defendant knew "such tapes would be important to any litigation over an accident that resulted in serious injury or death, and...that litigation is frequent when there has been an accident involving death or serious injury."). Courts have found the duty to preserve to be triggered based on an internal investigation into an incident. *See Marcum v. Scioto County, Ohio,* No. 1:10-cv-790, 2013 WL 955844, *7 (S.D. Ohio. Nov. 21, 2013). The *Zubulake* court found the duty to preserve was triggered before the filing of the administrative complaint, when relevant people anticipated litigation. *Zubulake*, 220 F.R.D. at 217. Courts have also recognized in the context of civil claims brought pursuant to 42 U.S.C. § 1983, that evidence gathered during the course of a prior criminal investigation was subject to a duty to preserve based on the reasonable foreseeability of a criminal prosecution and subsequent habeas petition at the time such evidence was gathered. *See Tennison v. City and County of San Francisco*, No. C 04-0574 CW, C 04-1643 CW, 2006 WL 733470, *38 (N.D. Cal. Mar. 22, 2006). Based on the framework as set forth above, this court concludes that a party's duty to preserve arises when it has notice that the documents might

---

documents represented the plaintiff in the underlying transaction at issue); *In re Semrow,* No. 03–CV–1142, 2011 WL 1304448, at *3 (D. Conn. March 31, 2011) (finding that duty to preserve vessel arose prior to commencement of suit because the fact that fatalities occurred should have put party on notice of future litigation); *Creative Res. Gr. of New Jersey, Inc. v. Creative Res. Grp.,* 212 F.R.D. 94, 106 (E.D.N.Y. 2002) (concluding that the duty to preserve arose months prior to the commencement of the lawsuit when the problems that eventually led to the filing of the lawsuit first surfaced).

be relevant to a reasonably-defined future litigation. Ultimately, the court's decision as to when a party was on notice must be guided by the particular facts of each case. *Cache La Poudre*, 244 F.R.D. at 621.[8]

Once it is established that a party's duty to preserve has been triggered, the inquiry into whether a party has honored its obligation to preserve evidence turns on reasonableness, which must be considered in the context of whether "what was done-or not done-was *proportional* to that case and consistent with clearly established applicable standards." *Rimkus Consulting Group, Inc. v. Cammarata,* 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010) (emphasis in original). *See also Ashton v. Knight's Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Texas 2011) (Once litigation is reasonably anticipated, a potential party to that litigation "must not destroy unique, relevant evidence that might be useful to an adversary.") (quotation marks and citation omitted); *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1107 (D. Ariz. 2014) ("the duty to preserve evidence should not be analyzed in absolute terms...because the duty cannot be defined with precision…[t]he Court must look at reasonableness under the circumstances.") (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522 (D. Md. 2010).

---

[8] In determining when a duty to preserve arose, the Second Circuit has focused the inquiry on whether the evidence was destroyed at a time when fear of potential future litigation could have plausibly motivated the spoliation. *Kronisch*, 150 F.3d at 127. The Eighth Circuit has instructed that the "ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence *indicating a desire to suppress the truth*, not the prospect of litigation." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (emphasis added).

2.      The Law As Applied to the Facts of This Case

In the context of this case, the court finds that Defendants' duty to preserve evidence about Mr. Johnson arose once Defendants knew, or should have known, that Mr. Johnson's conduct could subject them to litigation, either in a criminal or civil context.   Based on this court's review of the evidence proffered by all Parties in the context of this instant motion, the court concludes that Defendants' duty to preserve was triggered no later than March 15, 2012, when the School District placed Mr. Johnson on administrative leave.   At this time, the School District was on notice of concerns regarding Mr. Johnson's inappropriate conduct with children—of both a non-sexual and sexual nature—and knew, or should have known, that his conduct could subject them to litigation.   [#89-27].   In so deciding, the court observes that Defendants' duty to preserve may have been triggered prior to March 15, 2012, but for certain decisions on the part of the Individual Defendants not to investigate concerns regarding Mr. Johnson, despite their assurances to parents that an investigation into the rumors surrounding the nature of the relationship between Mr. Johnson and Plaintiff would be undertaken.   The record is clear that no such investigation ever occurred.

There can be no question that before Plaintiff finished eighth grade in 2011, the Individual Defendants knew of rumors of an inappropriate relationship between Mr. Johnson and at least two female students, Ms. Zbylski and Grace Buck.   Defendant McMurphy apparently found it necessary to address students *en masse* that such gossip must stop [#70-4 at ¶ 11], and assured Mr. Coleman that there was no cause for concern with regard to Mr. Johnson and Plaintiff [#89-12 at 31:5-10].   Similarly, Defendant Dierberger was cognizant of the rumors and the specific allegation that Mr. Johnson was sexually involved with Plaintiff.   [#89-6 at 92:16-

20]. Multiple students who attended Rocky Heights Middle School testified that the rumors regarding Mr. Johnson's inappropriate relationships with his female students were pervasive. [#70-4; #70-9 at 123:17-124:15; #70-10 at 20:2-13; #89-3 at 4-12]. Yet nothing in the record suggests that the Individual Defendants ever asked Mr. Johnson specifically about his relationship with these two young women or directed Mr. Johnson to change his behavior with respect to his female students. And Ms. Zbylski testified that no one ever asked her about the rumors. [#89-2 at 176:7-19].

By the beginning of the 2011-2012 school year, Principal Dierberger had a list of concerns regarding Mr. Johnson, his performance as a teacher, and his conduct towards students both inside and outside of school. Regardless of whether Mrs. Gross again informed Defendant Dierberger during their meeting in the summer of 2011 that she should be concerned about the relationship between Mr. Johnson and Plaintiff, there is no dispute that Mr. Johnson aggressively confronted Kyle in early summer 2011 at a recreation center over Mr. Johnson's relationship with Plaintiff [#90-10 at 175:1-176:7; #89-6 at #89-6 at 104:20-105:16; #70-5 at 233:22-234:12]; that Principal Dierberger was told of the encounter between Mr. Johnson and Kyle in a meeting that summer [#89-6 at 105:2-6]; and that Principal Dierberger "was very upset with him," and found the incident sufficiently serious to address it directly with Mr. Johnson [#89-1 at 253:21-254:22; #70-5 at 233:20-236:1]. By February 2012, Defendant Dierberger was watching Mr. Johnson decline personally and professionally, acknowledged in an e-mail that he was plagued by the "rumors/gossip" [#89-20], and prior to the child-throwing incident, was arranging for him to take a leave of absence because "she need[ed] him to take a break from teaching," though she was "sure that [Mr. Johnson] will not like it." [#89-21]. On or about March 2, 2012, Mr.

Johnson apparently had a "major meltdown" during a teacher in-service [#70-6 at 92:16-20], and by mid-March 2012, Defendant DCSD was sufficiently alarmed by Mr. Johnson's conduct toward students, *i.e.* the child-throwing incident, that it had a meeting with Defendant Dierberger, Mr. Johnson, and Mr. Johnson's union representative, at which time Mr. Johnson was told that Defendant DCSD would initiate the dismissal process unless Mr. Johnson resigned. [#89-27 at 1; #70-20]. No later than March 2012, based on the cumulative nature of the prior incidents and reports of inappropriate conduct toward students (both of non-sexual and sexual nature), Defendant DCSD was on notice or should have been on notice that it might be subject to future litigation by Mr. Johnson *or* a student who had been subjected to inappropriate conduct by Mr. Johnson. Thus, no later than March 2012, Defendant DCSD was under a duty to preserve documents related to Mr. Johnson and any records of allegations of inappropriate conduct by him, as well as a duty to inform key personnel, including Defendant Dierberger, of their duty to preserve documents. This conclusion is reinforced by the fact that Mr. Johnson's union representative was present at a meeting when Defendant DCSD through its representative told Mr. Johnson of its intention to initiate termination proceedings against him; this reflects an understanding on the part of Defendant DCSD that its relationship with Mr. Johnson regarding his conduct towards students was, by that time, adversarial. [#70-14 at 25-80:16].

The fact that Mr. Johnson ultimately resigned does not negate the triggering event for the purposes of preservation. While Mr. Johnson agreed to resign in March 2012, Defendant DCSD had no guarantee that it would not be subject to claims from, at a minimum, Mr. Johnson and potentially students until at least June 14, 2012. Mr. Johnson did not execute the Settlement Agreement, Waiver and Release ("Settlement Agreement") with Defendant DCSD until June 7,

2012. [#70-23].  The Settlement Agreement permitted him an additional seven calendar days to rescind, and specifically provided that "[t]he terms of this Agreement [including any waiver of claims by Mr. Johnson against Defendant DCSD] will not become effective unless Mr. Johnson signs this agreement and does not invoke his right to rescind as set forth above."  [*Id.* at ¶ 10(c)]. By that time, Dea Aragon, a detective for the Special Victims Unit for the Douglas County Sheriff's Office, had contacted Defendant DCSD's Area Manager, Department of Safety and Security, Mark Knapp to obtain information regarding Mr. Johnson [#70-1 at 90:23-92:22] and Plaintiff [#70-24].  Defendant DCSD testified, through its corporate designee Robert Ross, Jr., that it was aware of the kind of work that the Special Victims Unit performed, *i.e.*, "crimes against children, sexually related crimes or crimes against individuals who have some limited capacity to speak for and defend themselves."  [#70-14 at 68:17-69:6].  Indeed, no later than June 4, 2012, Defendant DCSD knew, or should have known, that documents related to sexual conduct by Mr. Johnson involving Plaintiff were potentially relevant to a reasonably-defined future criminal or civil proceeding.

Nor does the fact that Defendants did not affirmatively know as of March 2012 that Mr. Johnson had been sexually assaulting Plaintiff absolve Defendants of the duty to preserve documents related to Mr. Johnson's conduct by that time.  By March 2012, it was, or should have been, reasonably foreseeable to Defendants that Mr. Johnson's conduct towards his students had been inappropriate in multiple ways:  (1) Principal Dierberger herself had witnessed a female student sitting in a short skirt atop Mr. Johnson's desk and had reprimanded him for it; (2) there were rumors of his inappropriate conduct toward female students; (3) he had aggressively confronted a former student at a recreation center off-campus; (4) he had watched and laughed

while a student was thrown into the air and allowed to fall to the ground without being caught; and (5) the Individual Defendants knew that they had not personally conducted any investigation of any depth into the veracity of rumors that Mr. Johnson was engaged in sexual conduct with Plaintiff or other female students.  By June 4, 2014, Defendant DCSD was on notice through its Department of Safety and Security that there was an ongoing inquiry by the Special Victims Unit that investigated "crimes against children, sexually related crimes or crimes against individuals who have some limited capacity to speak for and defend themselves," involving Mr. Johnson and Plaintiff.  If the court concluded that no obligation to preserve documents was triggered until a party knew of a *specific* litigation involving *specific* allegations that were, in fact, *true*, *i.e.*, Defendants knew that Mr. Johnson was sexually assaulting Plaintiff, parties would have an incentive, or at least the opportunity, to destroy evidence while avoiding undertaking any investigation that might confirm suspicions of wrongdoing.  That simply cannot be. [9]

It is unclear when documents related to the suspensions of Kyle Gross and Keith Coleman, including their respective written statements, went missing; there is no evidence in the

---

[9] This court does not now speculate as to how Plaintiff or Mr. Johnson would have responded had they been asked directly about their relationship.  [#89-2 at 67 (deposition of Plaintiff): "I totally wanted to tell people, yeah, but I didn't—I did not have the strength in me at that time to tell people.  And no one came asking, so it was not going to come out of my mouth, no."]  But contrary to Defendants' suggestion in its Response, the court does not find that Defendants were not reasonably on notice of their duty to preserve documents related to Mr. Johnson because the third parties like Mr. Coleman and Mrs. Gross did not independently report the alleged abuse.  [#89 at 3-11].  Defendants, unlike Mr. Coleman and Mrs. Gross, had access to multiple sources of concern regarding Mr. Johnson's conduct toward students.  While the court does find it troubling that Defendants failed to investigate reports about sexual contact between Mr. Johnson and Ms. Zbylski, all the while assuring concerned parents that such an investigation would or was occurring, this instant analysis does not turn on the failure to investigate but the cumulative evidence that demonstrates that by March 2012, Defendants knew or should have known that Mr. Johnson's conduct toward students could give rise to future litigation, and documents regarding such conduct might be relevant to such actions.

record associated with this instant motion about how such documents were stored, when they were purged, or whether they were in existence as of March 2012.  It is also unclear how the District would have maintained any notes taken by an unidentified administrator during the meeting with Mrs. Gross in the summer of 2011, and if such notes were in existence as of March 2012.  However, it is clear that as of March 2012 and even as of June 4, 2012, Defendant Dierberger still possessed notes concerning Mr. Johnson and his conduct towards students. Defendant Dierberger took home "15, 20" boxes from her office at the school and shredded by hand all of her notes from her tenure as principal of Rocky Heights Middle School six to seven weeks after her retirement in May-June 2012.  [#70-6 at 46:10-15; 84:12-13].   Those notes included comments regarding Mr. Johnson's aggressive behavior toward Kyle Gross at a recreation center off school grounds, and concerns Principal Dierberger had about Mr. Johnson's conduct.   [#70-6 at 50:4-51:19; 83:13-16; 256:14-20].   Despite having notice of potential litigation resulting from Mr. Johnson's removal from Rocky Heights Middle School in March 2012, and notice of Detective Aragon's contact with Defendant DCSD's Safety and Security Department about Mr. Johnson and Plaintiff, Defendant DCSD did not provide its employees any direction as to the preservation of documents relating to Mr. Johnson's employment during the criminal investigation.  [#70-14 at 66:20-67:17].  Given the long trail of concerns involving Mr. Johnson, I find that Defendant DCSD's failure to direct Defendant Dierberger, or any other employee, to preserve documents as of March 2012 was unreasonable.

B.    *Statutory Duty*

Plaintiff asserts that pursuant to federal regulations and DCSD policy, Defendants had a duty to preserve Defendant Dierberger's notes, Keith Coleman's written statement from April

2011, and the notes and letter from the June 2011 meeting with Kyle Gross's parents, as well as "other relevant documents regarding Johnson's conduct and performance issues, such as his break-down during the 2011-2012 school year and DCSD's investigation following the 'child throwing incident.'" [#70 at 15]. Plaintiff also asserts that Defendants were required under state law to preserve documents relevant to the discipline Keith Coleman and Kyle Gross received. [*Id.* at 18].

### 1. Federal Regulation

Plaintiff identifies 29 C.F.R. § 1602.40 as requiring a school district or individual school to preserve personnel or employment records for a certain period of time following the personnel action. This regulation was promulgated by the Equal Employment Opportunity Commission and provides in relevant part:

> Any personnel or employment record made or kept by a school system, district, or individual school (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, layoff, or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by such school system, district, or school, as the case may be, for a period of 2 years from the date of the making of the record or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of 2 years from the date of termination

29 C.F.R. § 1602.40. This regulation can create a duty to preserve. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987) (concluding that defendant's violation of 29 C.F.R. § 1602.40 entitled plaintiff to "the benefit of a presumption that the destroyed documents would have bolstered her case."). *See also Byrnie*, 243 F.3d at 109 ("[W]here…a party has violated an

EEOC record-retention regulation, a violation of that regulation can amount to a breach of duty necessary to justify a spoliation inference in an employment discrimination case.").

While Mr. Johnson ultimately resigned, Defendant DCSD was prepared to fire Mr. Johnson over the March 2012 incident, and avoided taking such employment action by accepting Mr. Johnson's resignation.  As discussed above, the resignation was not effective until June 14, 2012—after Detective Aragon contacted Defendant DCSD.  In *Hicks*, the Tenth Circuit determined that certain records were subject to section 1602.40 because they "were routinely used for determining whether disciplinary action should be taken." *Hicks*, 833 F.2d at 1419. Records and notes of the March 2012 incident were not ultimately used to support Mr. Johnson's termination, but presumably would have been used and relied upon in determining whether disciplinary action was warranted.  I find this regulation imposed upon Defendants a duty to maintain records relating to the March 2012 incident, but based on the record before me, I cannot conclude that additional documents existed.   To the extent that evidence subsequently adduced and presented to the court at trial or otherwise shows the existence of such documents, Plaintiff may seek leave to raise the issue of spoliation to the court or the presiding judge, the Honorable Marcia S. Krieger, at that time.

### 2. State Statutes

Plaintiff identifies Colo. Rev. Stat. § 24-80-102.7 as requiring DCSD "to create and follow its own document retention schedule."  [#70 at 17].   Section 24-80-102.7 requires in pertinent part all state agencies to "[e]stablish and maintain a records management program for the state agency and document the policies and procedures of such program."  Colo. Rev. Stat. §

24-80-102.7(2)(a).  "State agency" is defined as "any department, division, board, bureau, commission, institution, or agency of the state."  Colo. Rev. Stat. § 24-80-102.7(1).

Defendants argue that in Colorado, school districts are considered political subdivisions, not state agencies.  Indeed, section 402 of Article 6 in Title 24, provides that "[p]olitical subdivision of the state" shall include "any…school district."  Colo. Rev. Stat. § 24-6-402(1)(c). *See Branson School District RE-82 v. Romer*, 958 F. Supp. 1501, 1507 (D. Colo. 1997) ("Colorado courts have conclusively stated that Colorado school districts are political subdivisions of the state") (citation omitted).[10]  Accordingly, I find that Colo. Rev. Stat. § 24-80-102.7 is likewise not pertinent here.

Plaintiff also identifies Colo. Rev. Stat. § 22-32-109.1 as requiring Defendants to preserve documents relevant to the April 2011 disciplinary action taken as to Keith Coleman and Kyle Gross.  Section 22-32-109.1 instructs school principals to report to the board of education of the school district "action taken" with respect to students who are "willfully disobedient or openly and persistently defiant…"  Colo. Rev. Stat. § 22-32-109.1(2)(b)(IV)(E).  "Action taken" includes in-school suspension.  *Id.* at § 22-32-109.1(1)(a)(I).  However, as Defendants note, the in-school suspensions for Kyle Gross and Keith Coleman were rescinded.  Presumably, the effect of the rescission would have been to obviate the need to report that action.

---

[10] Significantly, a state agency may be entitled to Eleventh Amendment immunity but a political subdivision is not.  Therefore, a judgment against a political subdivision would not be paid from the state treasury.  *Elam Const., Inc. v. Regional Transp. Dist.*, 980 F. Supp. 1418, 1421 (D. Colo. 1997) (quoting *Sonnenfeld v. City and County of Denver,* 100 F.3d 744, 749 (10th Cir. 1996).

C.      *DCSD Policies*

Finally, Plaintiff contends that Defendants violated DCSD policies in failing to preserve records regarding the conduct of Mr. Johnson and the disciplinary action taken against Keith Coleman and Kyle Gross.   [#70 at 17, 19].   The policy referred to by Plaintiff as "GBJ," mandates the retention of "records and information relative to compensation, evaluations, and such other information as may be considered pertinent" in a DCSD employee's personnel file. [#70-27].  The policy referred to by Plaintiff as "JRA/JRC," requires the school principal, as the official custodian of the school's student records, to preserve all records concerning "teacher or counselor ratings and observations" and "reports of serious or recurrent behavior patterns."  [#70 at 19].[11]   DCSD policy further requires that records relating to students, including "student discipline, suspension, and expulsion records," be kept for three years "after school year in which records were created."   [#70-29].   Plaintiff represents that, "by November 2012, DCSD claimed that it was not able to locate any" of the records pertaining to the disciplinary action taken against Kyle Gross and Keith Coleman and these records "had apparently also been destroyed."  [#70 at 19].

Defendants argue that information is "pertinent" only if it leads to an employment action; and, as noted above, the records of the students' disciplinary action were not preserved because the action was rescinded.   [#89 at 19-20].   Defendants rely on Mr. Ross, as the corporate designee of Defendant DCSD, in defining "pertinent."   However, Mr. Ross acknowledged during his deposition that whether a record is considered "pertinent" depends entirely on the situation.

---

[11] This language is not included in the exhibit to which Plaintiff cites [#70-28]; however, Defendants do not contest that the language exists in a DCSD policy.  *See* [#89 at 20].

[#89-30 at 79:10-16].  He further acknowledged, "[i]f there is going to be employment action taken based on an investigation, then [the personnel file] is the place that that should be."  *Id.*

As discussed above, it is not disputed that Kyle Gross and Keith Coleman were disciplined for behavior that involved Mr. Johnson, and those records, including the statements written by Kyle and Keith, would have been subject to the DCSD retention policy had the in-school suspensions not been rescinded.  Given the rescission of the suspensions, however, it is not clear that this policy would have applied to such documents.  Furthermore, the events that led to Mr. Johnson's resignation are undisputed, such as the video of him laughing as the child was thrown into the air and the subsequent meeting at which he agreed to resign in lieu of termination.  As with 29 C.F.R. § 1602.40, DCSD policies require the retention of information that *could* lead to an employment action.  In this case, information supporting that contemplated termination were "pertinent," and should have been stored in Mr. Johnson's official file until at least June 14, 2012.  *See* [#89:30 at 79:17-20 (Deposition of Rule 30(b)(6) deponent Mr. Ross) ("So there was an investigation conducted of Richard Johnson with respect to an incident in March 2012, correct?" "I believe there was.")].  But as discussed above, it is not clear that additional documents related to an investigation into the March 2012 incident ever existed.

Nevertheless, Defendant Dierberger witnessed a young female student in a short skirt inappropriately sitting atop of Mr. Johnson's desk; she reprimanded Mr. Johnson for that incident; and the preponderance of the evidence suggests that she took notes regarding that incident.  [#70-6 at 129:25-132:25].  In addition, Defendant Dierberger specifically met with Mrs. Gross about Mr. Johnson's confrontation with Kyle over Memorial Day 2011, and Principal Dierberger verbally reprimanded Mr. Johnson for that interaction.  In addition, Defendant

Dierberger testified that if she noted a pattern of behavior with a certain teacher, her practice was to place a copy of her notes regarding the behavior in the teacher's official file. [#70-6 at 44:10-45:2]. By the 2011-2012 school year, Defendant Dierberger had a litany of concerns about Mr. Johnson. [#70-6 at 50:4-51:19; 129:7-24]. The court finds that these records and information relate to "compensation, evaluations, and such other information as may be considered pertinent" to Mr. Johnson, and should have been maintained per Defendant DCSD's policy in his personnel file. Defendant Dierberger testified that she did not purge any files for Mr. Johnson after he separated from Defendant DCSD, and such records should have been maintained by Rocky Heights Middle School or Defendant DCSD. [#70-6 at 90:5-11]. Yet any such notes memorializing the concerns she testified to having had with regard to Mr. Johnson are missing from Mr. Johnson's official file. Defendants either failed to create a record of the events, or they failed to preserve them. In any event, none of these records and/or notes were available by November 2012, which post-dates the period, identified above, on which Defendants should have known that records and notes regarding Mr. Johnson's behavior—either as it relates to Plaintiff or other children under his supervision—may be relevant to future litigation.

### III.   Prejudice to Plaintiff

Spoliation sanctions are proper when the court determines that a party had a duty to preserve relevant evidence, and the adverse party was prejudiced by the destruction of the evidence. *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir. 2007). The prejudice must be actual, rather than merely theoretical. *Id.* at 1032-33. Plaintiff claims prejudice results from the destruction of the documents described above because those materials support her argument that Defendants knew of the sexual abuse by Mr. Johnson, and without this

evidence she is disadvantaged in disputing Defendants' pending Motion for Summary Judgment. [#70 at 20].

Title IX prohibits sex discrimination by recipients of federal education funding: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (quoting 20 U.S.C. § 1681I(a)). "Title IX implies a private right of action for monetary damages to enforce its prohibition of intentional sex discrimination 'in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student.'" *Id.* To prevail on her damages claim, Plaintiff must prove "an official who at a minimum [had] authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [had] actual knowledge of discrimination in the recipient's programs and fail[ed] adequately to respond." *J.M. v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 450 (10th Cir. 2010) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)). Plaintiff must show there was "an official decision…not to remedy the violation," because application of a lesser standard would present the risk "that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." *Id.* To that end, the elements of a Title IX action are as follows: (1) an official is deliberately indifferent to sexual harassment; (2) of which there was actual knowledge; (3) and the harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational

opportunities or benefits provided by the school." *Id.* (quoting *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)).

Contrary to Defendants' suggestion, Plaintiff alleges that she was subjected to sexual harassment through Mr. Johnson's sexual advances short of intercourse, as well as based on his subsequent sexual assaults. [#61 at ¶¶ 25, 33]. Therefore, the fact that Defendants did not know prior to October 2012 that Mr. Johnson was sexually assaulting her is not dispositive of whether Plaintiff has been prejudiced by the loss of evidence. The court finds that Plaintiff has been deprived of at least contemporaneous notes made by Defendant Dierberger that reflected her knowledge of the allegations of misconduct by Mr. Johnson, including whether she knew that Kyle Gross told her that Mr. Johnson was always "hugging on" Plaintiff, speaking with her closely, and flirting with her. [#70-9 at 173:7-18]. The court also finds that the missing records from Mr. Johnson's personnel file has deprived Plaintiff from understanding whether any corrective action was taken as to Mr. Johnson with respect to complaints of his inappropriate conduct towards students, which is relevant to whether Defendants acted with deliberate indifference.

## IV.    Sanctions

Where the party claiming prejudice seeks an adverse inference to remedy the spoliation, it must also prove bad faith. *Turner*, 563 F.3d at, 1149-50. "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.* (quoting *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997). Although this court has found that there are missing documents, and such missing documents have prejudiced Plaintiff's ability to establish her claims based on acts by Mr.

Johnson short of sexual assault, based on the record before it, this court does not find that Defendants acted in bad faith.   Instead, the record indicates that Defendants and their representatives, including the Individual Defendants, the Department of Safety and Security, and the Human Resources Department responsible for maintaining official personnel files, failed to properly and adequately coordinate to ensure that documents relevant to Mr. Johnson's misconduct toward students, both of a non-sexual and sexual nature, were maintained during the pendency of Mr. Johnson's separation from Defendant DCSD beginning in March 2012 and after the initiation of contact by the Douglas County Sheriff Department's Special Victims Unit on June 4, 2012.   Therefore, this court concludes that an adverse inference arising from the spoliation for the purposes of summary judgment is not appropriate.

Without a showing of bad faith, a district court may only impose lesser sanctions.  *Henning v. Union Pacific R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008).  In addition, such sanctions should be proportional with the violation.  Because the court finds that Plaintiff established, by a preponderance of the evidence, that spoliation occurred for some documents but not others, it awards Plaintiff half (50%) of her reasonable attorneys' fees and costs incurred in connection with the filing of this instant motion.  However, this court recognizes that monetary sanctions do not appear to be Plaintiff's true objective.  [#70 at 23-24].  To the extent Plaintiff seeks preclusion of certain evidence, such as "countering evidence to rebut K.C.'s testimony regarding the content of his written statement and K.C's [sic] father's testimony that McMurphy showed him the written statement the following day, when the boys arrived for their in-house suspension," [*id.* at 24], such sanctions are more appropriately determined by Chief Judge Krieger as the presiding judge, after she resolves the pending motion for summary judgment and

perhaps within the context of the admitted evidence and credibility of witnesses as offered at trial, with the assistance of findings reflected in this Order as she deems appropriate. *See Montoya v. Newman*, --- F. Supp. 3d ----, 2015 WL 4456194, *18 n.6 (July 21, 2015); *E.N. v. Susquehanna Tp. School Dist.*, No. 1:09-cv-1727, 2011 WL 2790266, *3-*4 (M.D. Pa. July 14, 2011). Therefore, this court declines to award any other sanctions, without prejudice to Plaintiff to renew her request at the appropriate time, as determined by Chief Judge Krieger.

## CONCLUSION

For the reasons set forth herein, it is hereby **ORDERED**:

(1)     Plaintiff's Motion for Sanctions for Spoliation of Evidence [#70] is **GRANTED IN PART and DENIED IN PART**;

(2)     The court **AWARDS** Plaintiff half (50%) of reasonable attorneys' fees and costs associated with the filing of this instant motion;

(3)     Plaintiff will submit an application for her reasonable attorney's fees and costs associated with the filing of this instant motion, for the court's consideration no later than **January 22, 2016**, to which Defendant will have an opportunity to respond no later than **February 12, 2016**; and

(4)     Plaintiff's original Motion for Sanctions [#66] is **DENIED as MOOT**.


DATED: December 31, 2015                    BY THE COURT:


                                            s/ Nina Y. Wang
                                            Nina Y. Wang
                                            United States Magistrate Judge